## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Southern Division)

**Byron Tribue**
c/o 1201 Reisterstown Rd.
Pikesville, MD 21208[1]
(Resident of Prince George's County, MD)

**Matin Dunlap**
c/o 1201 Reisterstown Rd.
Pikesville, MD 21208
(Resident of Baltimore, MD)

**Analisse Diaz**
2907 Siwanoy Dr.
Edgewood, MD 21040

**On behalf of themselves and others
similarly situated**
    **Plaintiffs,**
  **v.**

**Maryland Department of State Police**
1201 Reisterstown Rd.
Pikesville, MD 21208
*Serve Counsel:*
Ronald M. Levitan
Principal Counsel
Maryland Department of State Police
Office of the Attorney General
1201 Reisterstown Rd.
Pikesville, MD 21208
    **Defendant.**

Case No.: _____

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs, Byron Tribue, Analisse Diaz and Matin Dunlap, on behalf of themselves and

others similarly situated, by and through the undersigned counsel, file this lawsuit against

Defendant the Maryland State Department of Police ("Defendant" or "MSP"), and state as follows:

---

[1] As current service law enforcement officers for the Maryland State Police, the home addresses of Plaintiffs Byron Tribue and Matin Dunlap are not publicly listed in this Complaint. Their addresses are known to Defendant.

## **NATURE OF THE ACTION**

1.      Plaintiff Tribue, Plaintiff Diaz, Plaintiff Dunlap, and other similarly situated Officers of Color bring this civil action to recover damages and civil penalties arising from unlawful employment practices by Defendant MSP, and to obtain injunctive relief to stop this ongoing discrimination. MSP has engaged in a pattern or practice of systemic discrimination against Officers of Color, including:

a.   Maintaining centralized disciplinary policies and procedures that disparately treat Officers of Color by imposing unfounded, unwarranted and overly severe and disparate penalties, including suspensions, terminations, demotions, transfers, and denials of promotions and other advancement opportunities;

b.   Maintaining centralized policies and procedures for promotions that disparately deny Officers of Color promotions;

c.   Intentionally discriminating against Officers of Color through disparate treatment of these officers through disciplinary measures and denial of promotions;

d.   Maintaining and allowing a hostile work environment, including, but not limited to, subjecting Officers of Color to racist comments and symbols such as using a paper training dummy at a MSP shooting range with a black face and "Afro  wig" for officers to shoot at, making a commemorative coin with the phrase "Make Waldorf Great Again;" commencing unwarranted and unfounded investigatory/disciplinary proceedings against Officers of Color; imposing overly severe disciplinary

penalties; transferring Officers of Color to less favorable and/or more dangerous assignments and shifts; assigning Officers of Color to positions that require lengthy commutes; denying Officers of Color overtime opportunities; and retaliating against Officers of Color who have opposed discrimination.

2.     The disparate discipline against Officers or Color is enacted and authorized by the MSP Internal Affairs Department, which is the centralized office of the MSP tasked with assessing potential officer misconduct, determining whether to propose discipline against an officer, and deciding the type and degree of discipline to propose for an officer.

3.     The disparities in the promotional opportunities for Officers of Color versus Caucasian officers are carried out through MSP's centralized promotional process and its promotional ranking system.

4.     MSP employs a further policy of retaliating against Officers of Color who complain about discrimination, including disparate discipline as compared to Caucasian officers. MSP treats Officers of Color who report discrimination less favorably than Caucasian officers who report discrimination.

5.     The disparate discipline Plaintiffs faced resulted in terminations, lost promotions, and demotions, and it also caused Plaintiffs harms including losing pay; suffering damages to their professional reputation; lost supplemental employment; lost retirement benefits; and personal pain and suffering.

## **JURISDICTION AND VENUE**

6.     This Court has original jurisdiction over this Complaint pursuant to 28 U.S.C. § 1331 because those claims arise under the United States Constitution and laws of the United States.

3

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)-(2) because all of the events, acts, and/or omissions giving rise to Plaintiffs' claims occurred in the State of Maryland.

8.     The amount in controversy as set forth in the complaint exceeds $75,000.00 in an amount to be determined by the jury.

## PARTIES AND ENTITIES

9.     Plaintiffs are all current or former uniformed police officers of the MSP who are persons of color, including Black, Hispanic, Asian-American, South Asian and Middle Eastern officers. All Plaintiffs have been subject to discrimination during their employment at the MSP on the basis of their race, color, and/or national origin.

10.    Plaintiff, Byron Tribue, is a Black man residing in Maryland. At all relevant times Officer Tribue was an employee of the MSP, and stationed in the MSP's Barracks in Prince George's County, MD and Montgomery County, MD.

11.    Plaintiff, Analisse Diaz, is a Black Puerto Rican woman residing in Maryland.  At all relevant times Officer Diaz was an employee of the MSP.

12.    Plaintiff, Matin Dunlap, is a Black man residing in Maryland.  At all relevant times Officer Dunlap was an employee of the MSP.

13.    Plaintiffs bring this case on behalf of themselves and other similarly situated Officers of Color at MSP. Some of these other similarly situated employees have filed Charges of Discrimination with the U.S. Equal Employment Opportunity Commission (EEOC), and cross filed with Fair Employment Practice Agencies (FEPAs). These Plaintiffs will be added to this civil action after receipt of their Notice of Right to File Suit from the EEOC. Officer Tribue has filed

has a Charge of Discrimination pending at the EEOC and will amend this Complaint to include his EEOC/FEPA claims.

14.     Defendant MSP, officially the Maryland Department of State Police, is the official state police force for the State of Maryland. The MSP is headquartered at 1201 Reisterstown Road, Pikesville, MD 21208 located in unincorporated Baltimore County.

## FACTS COMMON TO ALL COUNTS

### Policies Governing Plaintiffs' Employment at MSP

15.     MSP is bound by the Fourteenth Amendment to the United States Constitution, which guarantees citizens equal protection of the laws of the United States, with violations thereof giving rise to claims for relief under 42 U.S.C. § 1983. Section 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the United States Constitution and laws" by persons acting under the color of law.  The right to be free from racial discrimination in employment and retaliation for assertion of one's civil rights are both clear and well-established rights that employees of MSP have and are well known by MSP.

16.     MSP is bound by 42 U.S.C. § 1983, which guarantees that all persons shall have the right to make and enforce contracts, including employment contracts free from all forms of discrimination on the basis of race, and also 42 U.S.C. § 1983, which protects against the "deprivation of any rights, privileges, or immunities secured by the United States Constitution and laws" by persons acting under the color of law.  The right to be free from racial discrimination and harassment in employment and retaliation for assertion of one's civil rights were clear and well-established rights, known to MSP.

17.     MSP is required to follow Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1, *et seq.* Title VII makes it unlawful to discriminate against employees on the basis of

their race, color, and/or national origin, and makes it unlawful to retaliate for making complaints about any of the above.

18.     MSP is required to follow Title 20 of the Maryland Human Relations Act, which makes it unlawful to discriminate against employees on the basis of their race, color, and/or national origin, and makes it unlawful to retaliate for making complaints about any of the above. In addition, MSP is required to follow the anti-discrimination laws of the specific localities where MSP employs troopers, including the Prince George's County Human Rights Act and the Montgomery County Human Rights Act.

19.     MSP represents to its employees that "[i]t is the policy of the Maryland Department of State Police to afford equal employment opportunity to qualified individuals regardless of their sex, age, ancestry, race, color, creed, gender Identity/Expression, national origin, religious affiliation belief or opinion, sexual orientation, marital status, genetic information or disability." And that " [a]ny form of harassment or retaliation for reporting discrimination will not be tolerated.  Threats or acts of retaliation against witnesses testifying in regard to discrimination or harassment are likewise prohibited."

## MSP's Pattern or Practice of Discrimination Against Officers of Color

20.     Plaintiffs and others similarly situated are current and former MSP officers who are all persons of color. As detailed herein, Plaintiffs were all subject to a pattern or practice of the MSP to discriminate against Officers of Color. This includes unduly harsh discipline, including demotions, and termination, as well as systematically denying Officers of Color promotions, and subjecting officers to discrimination and harassment.

21.     On July 15, 2022, the United States Department of Justice announced that "it has opened a civil pattern or practice investigation into the Maryland Department of State Police . . .

under Title VII of the Civil Rights Act of 1964" regarding whether the MSP has engaged in racially discriminatory hiring and promotion practices. Announcement available at https://www.justice.gov/opa/pr/justice-department-launches-investigation-maryland-department-state-police-under-title-vii (last accessed Oct. 24, 2022).

### ***Disparate Discipline***

22.     MSP has a pattern or practice of exacting unduly harsh and excessive discipline upon Officers of Color to which MSP does not subject Caucasian officers. MSP has a pattern or practice of disciplining Officers of Color for minor, negligible, and/or non-existent violations of MSP policies. These disciplinary actions exceed the recommended discipline for such alleged infractions as set forth in the MSP disciplinary matrix and policies. MSP has a pattern or practice of taking lengthy times to investigate, charge, and process disciplinary actions against Officers of Color, time which is not justified by the subject matter, facts, or policy, resulting in extending the lost income and/or reputational harms to Officers of Color in the disciplinary process.

23.     MSP does not subject similarly situated Caucasian officers to similar discipline for comparable or even more severe offenses, and in fact has a pattern or practice of declining to charge or investigate Caucasian officers for known and/or alleged misconduct.

24.     The disparate discipline Plaintiffs faced includes actions from the MSP Internal Affairs Department, which is the centralized office of the MSP that is tasked with assessing potential officer misconduct, determining whether to propose discipline against an officer, and deciding the type and degree of discipline to propose for an officer.

25.     The disparate discipline Plaintiffs faced results in similarly situated Plaintiffs to not only experience terminations, lost promotions, and demotions, it also caused Plaintiffs harms

including losing pay; suffering damages to their professional reputation; lost supplemental employment; lost retirement benefits; and personal pain and suffering.

### *Denials of Promotions*

26.     MSP also engages in a systemic pattern or practice of denying Officers of Color promotions, resulting in disproportionally fewer Officers of Color at all ranks of the MSP. MSP has a centralized process for evaluating officers for promotions. The disparity in promotions for Officers of Color cannot be explained by disparities in education, performance, experience, or any other legitimate, non-discriminatory reason.

27.     The MSP allows for promotion evaluations every two years. MSP further requires that officers be in their position for one year before they are eligible for promotions in the two-year cycle. This is not standard practice across the nation in other police departments. Other jurisdictions allow for much greater flexibility in their promotional structure.

28.     To qualify for a promotion, MSP looks at three factors: a written test; resume, and oral interview. Officers must also have been in their current rank for at least a year before they are eligible to apply.

29.     To qualify for promotion, the first factor is the written test, which requires a trooper (1) to score above a 60 and (2) to be within a the top scores for that testing cycle.

30.     The second component of the MSP promotional process is the "resume." The resume is a list/excel sheet that exclusively lists all the trainings the officer has completed, and the number of hours of each training.

31.     Troopers within Specialized Units have many more training opportunities and thus often receive a higher score on the resume portion of the test. Patrol officers, on the other

hand, typically have less training opportunities due to their workload and hours, and therefore frequently receive a lower score on the resume component.

32.     MSP has a pattern or practice of denying Officers of Color placement in Specialized Units. Officers of Color are represented in Specialized Units at a disproportionally low rate. This contributes to MSP's systemic disadvantages to Officers of Color in the promotional process.

33.     MSP's process for being assigned to a Specialized Unit is highly subjective and therefore subject to high levels of bias. To gain access to a Specialized Unit, an officer must appear before a panel of three superior officers within their unit. The specialized unit panel then scores each applicant. No objective standards exist except that one must be an officer and have no internal investigations open against them.

34.     The requirement that officers must have no internal investigations open against them disproportionally disadvantages Officers of Color due to MSP's pattern or practice of disproportionally disciplining Officers of Color for minor infractions, and also not disciplining Caucasian officers for similar or worse infractions. In addition, this requirement deters qualified Officers of Color from even applying to Specialized Units.

35.     After the interviews, MSP announces who has been selected to the Specialized Unit. Applicants to Specialized Units only hear if they were selected, and MSP does not inform them of their scores or how they ranked among their peers.

36.     Service in a Specialized Unit is not only an advantage for promotions, the Specialized Units provide officers better terms and conditions of employment given that the shifts are not rotating and officers within the unit are not on call.

37.     The last component of MSP's scoring for promotions is the oral interview. The oral interview is also a heavily subjective test. Officers of Color generally receive lower scores with no explanation.

38.     As a result, in the final scores, despite their excellent performance and credentials, Officers of Color are disproportionately not promoted within MSP, as compared to Caucasian Officers.

39.     Even the Officers of Color who receive high scores on the overall ranking are not promoted, including due to pretextual, discriminatory and punitive disciplinary measures taken against them, which impede their ability to be promoted.

40.     In addition to the subjective standards the MSP uses in granting promotions, the MSP has altered their internal standards to allow for more underqualified Caucasian Officers to be promoted. For example, in 2017, the MSP instituted a new policy of requiring an associate's degree for the rank of Corporal and a bachelor's degree for the rank of Lieutenant or higher. This was part of a larger national push to require advanced degrees for officers. During this time, a higher number of Officers of Color had to be promoted due to their advanced degrees. However, in 2020, the MSP ended this requirement. Upon information and belief, this was due to Officers of Color being overqualified regarding educational degrees when compared to their Caucasian counterparts. Upon information and belief, Officers of Color possess advanced educational degrees at a higher rate than their Caucasian counterparts. Due to a pattern or practice of discrimination in the MSP, Officers of Color need to have better credentials than their Caucasian counterparts to be hired.

### *Retaliation*

41.     MSP has a stated policy of non-discrimination, and asks employees to report any allegations of discrimination to the MSP Office of Fair Practice. MSP is also bound by the federal, state and local laws which prohibit retaliating against employees who make protected complaints of discrimination. However, MSP routinely and systematically fails to protect Officers of Color who make protected complaints of discrimination.

42.     When Officers of Color complain of discrimination, MSP's Office of Fair Practice has a pattern or practice of concluding that no discrimination has occurred, despite evidence presented, as well as a pattern or practice of ignoring and overlooking examples of overt racism.

43.     Upon information and belief, at least one employee of the Office of Fair Practice has quit in protest of these systemic failures in treating Officers of Color fairly.

44.     In addition, MSP has a pattern or practice of retaliating against Officers of Color for complaining about, or proposing discipline for, Caucasian officers who commit misconduct.

### *Harassment and Disparate Treatment*

45.     MSP has a pattern or practice of subjecting Officers of Color to racist comments and symbols such as using a paper training dummy at a MSP shooting range with a black face and "Afro  wig" for officers to shoot at, making a commemorative coin with the phrase "Make Waldorf Great Again." MSP has a pattern or practice of failing to take corrective action about such harassment.

46.     In addition, MSP has a pattern or practice of discriminating against Officers of Color in the terms and conditions of their employment. This includes denying Officers of Color

11

overtime opportunities, weekend shifts, and deliberately placing Officers of Color in positions where they will be subject to lengthy commutes.

## Individual Plaintiffs' Allegations

### Plaintiff Byron Tribue

Officer Tribue's Background and Performance

47.     Officer Tribue has been subjected to discrimination and retaliation by MSP, including being suspended for 301 days for an alleged one-hour error in recording his time card, and being denied promotions, during the course of his employment with MSP.

48.     Officer Tribue is a Black man.

49.     Officer Tribue is employed as a Sergeant with MSP been employed with MSP from February 1, 2010 until the present. During his employment with MSP, Officer Tribue has been recognized as a good performer and received professional recognition for the same. For example, in 2018, Officer Tribue earned the Non-Commissioned Officer of the Year for the Forestville Barrack in 2018, and also earned the highest performance rating of "Exceeds Expectations" in the two years before MSP chose to suspend him.

50.     In 2019, Officer Tribue ranked number 26 out of 96 on the Sergeant Promotional List. MSP appointed him as the Acting Sergeant of his group for nine months.

Officer Tribue's Prior Complaints of Discrimination

51.     During Officer Tribue's time with the MSP, he has observed many instances of discrimination against Officers of Color, and experienced discrimination himself. Officer Tribue has repeatedly spoken out about this discrimination, and is known to his colleagues and the MSP management as someone who has repeatedly opposed discrimination in the workplace. Officer Tribue prides himself on his willingness to speak out when he observes injustice. As a result of

his complaints and opposition to discrimination, MSP has further subjected Officer Tribue to discrimination and retaliation.

52.    Officer Tribue's complaints included complaints about discriminatory behavior of a higher-ranking employee, Detective Sergeant Christopher Bowling.

53.    For example, Officer Tribue complained that Bowling gave more opportunities for coveted overtime shifts to his Caucasian officer friends who were stationed outside of the Barrack, often those from Southern Maryland, instead of giving these shifts to Officers of Color within the Barrack. This meant that Officer Tribue along with other Officers of Color lost out on overtime opportunities and the overtime pay. No legitimate business need existed for Bowling to do this. Officer Tribue complained to Bowling about this many times, including in late 2019. Officer Tribue also complained about this to other members of MSP management in the Barrack.

54.    On January 28, 2020, Officer Tribue complained about another incident with D/Sgt. Bowling. A Caucasian officer outside the Barrack engaged in an unauthorized police chase with his car, which resulted in him running into an unrelated person's land and causing damage. The matter came to D/Sgt. Bowling's attention, but he declined to take any disciplinary action against this Caucasian officer. Based on Officer Tribue's observations and experience, if an Officer of Color had done something similar, they would face serious disciplinary action. Officer Tribue believed that D/Sgt. Bowling treated this officer more favorably because he was Caucasian. Officer Tribue complained about this disparate treatment to Bowling.

MSP's Discriminatory Suspension of Officer Tribue

55.    On Thursday, February 13, 2020 MSP suspended Officer Tribue for allegedly misrepresenting a singule hour on his time sheet. At the time of the suspension, Officer Tribue

had approximately 620 hours of Annual Leave. Officer Tribue was in a "use or lose" scenario because under MSP policy, he could only carry 600 hours into the new year.

56.     The suspension was for an alleged incident in January 2020, prior to Officer Tribue's January 28, 2020 complaint to D/Sgt. Bowling. On the date in question, Officer Tribue was scheduled to have a day off. However, the Commander of the Forestville Barrack requested that Officer Tribue attend a Supervisors meeting. While Officer Tribue could have claimed two hours of overtime for coming into the meeting, Officer Tribue opted to leave work one hour early on a later date, with permission from his supervisor. This is a common practice used by MSP officers statewide.

57.     On February 13, 2020, MSP told Officer Tribue he was being suspended for allegations of theft—the one hour he left early—and false reporting—the hour he did not claim when he left work one hour early.

58.     Furthermore, Officer Tribue had plenty of leave accrued and enough personnel were on duty and working that night. Nonetheless, MSP suspended him.

59.     MSP told Officer Tribue about the suspension after he arrived at work. MSP then notified Officer Tribue that because he was being suspended MSP would have to confiscate his vehicle, and asked him to remove all of his belongings from it. Officer Tribue stood outside in the parking lot, removing his personal possessions one by one, including his kids' two car seats. Employees stood by and watched Officer Tribue do this, making it clear that Officer Tribue was being placed on suspension. However, MSP did not notify employees that Officer Tribue had been suspended for a time card error of one hour. By publicly confiscating Officer Tribue's vehicle, the MSP made it appear that he had committed serious misconduct to warrant this public

14

spectacle. A fellow trooper had to drive Officer Tribue home with his belongings. Officer Tribue was humiliated by MSP's actions.

60.    MSP assigned Bowling—the same officer that Officer Tribue had previously lodged a discrimination complained against—to investigate his case.

61.    On April 3, 2020, Officer Tribue's supervisor confirmed that Officer Tribue had not engaged in misconduct regarding the time sheet incident. However, the MSP forced Officer Tribue to remain on suspension and an internal investigation continued.

62.    MSP refused to tell Officer Tribue what specific acts of misconduct they were charging him with, and what MSP was proposing as potential discipline until September 28, 2020, over seven months later. This extensive delay is contrary to MSP policy. There was no legitimate reason or justification for this lengthy suspension.

63.    Notably, this unwarranted suspension occurred shortly after the MSP ranking for the Sergeant Promotional List had been published in September 2020, and Officer Tribue was ranked 26 out of 96.

Proposed Discipline for Timecard Issue

64.    After more than seven months of investigation (for a one-hour time card error), on September 28, 2020, MSP finally issued Officer Tribue his charges. MSP charged Officer Tribue with four counts: two counts of neglect of duty; unauthorized secondary employment; and conduct unbecoming. These were two Category C and two Category B violations. Under the MSP disciplinary system category, charges escalate with severity with each subsequent letter of the alphabet. Category B and C charges are early in the alphabet and are relatively minor charges. Category B is considered minor misconduct, while Category C is considered misconduct.

65.     While Officer Tribue did not believe such disciplinary charges were warranted, at least these specific charges carried relatively light penalties. Under MSP's formal disciplinary matrix the maximum charges for such charges is an eight day suspension without pay and a $450 fine. Even though he believe the charges were unfounded, Officer Tribue was prepared to accept this discipline and move on with his life and career.

66.     Instead, MSP decided to exceed the disciplinary matrix range and proposed a final disciplinary action against Officer Tribue of a 30 day suspension without pay and a demotion from Corporal to Trooper First Class (non-supervisory position). This was an unjustifiably severe punishment.

67.     Officer Tribue was particularly concerned about the demotion because it meant he would lose additional income, and because he had worked very hard to earn the rank of Sergeant, and he knew how hard it was for Officers of Color to gain promotions within the MSP.

68.     Officer Tribue asked MSP why they had ignored the disciplinary matrix, and MSP stated words to the effect of "if you don't like it, you can go to a Trial Board."

69.     Under MSP policy, a "Trial Board" is a three-member group selected to hold a hearing and determine the final outcome of a disciplinary case. Cases are referred to a Trial Board when a trooper refuses to accept the discipline offered by the MSP.

70.      Given the severity of the charges, Officer Tribue felt that he had no choice but to go to a Trial Board.

MSP Keeps Officer Tribue on Suspension After Serving Charges

71.     Under MSP policy, once the investigation was concluded and Officer Tribue had received MSP's proposed disciplinary charges, MSP should have been reinstated Officer Tribue

to full duty. However, MSP refused to return Officer Tribue to work on or shortly after September 28, 2020, as they should have done pursuant to policy.

72.     Officer Tribue repeatedly asked MSP to reinstate him. MSP did not respond.

73.     The President of the National Association for the Advancement of Colored People (NAACP) of Prince George's County, MD wrote to the MSP on Officer Tribue's behalf, regarding the disparate discipline and promotions that Officers of Color, and Black troopers at the Forestville Barrack in particular, faced, including Officer Tribue, and asking for Officer Tribue to be reinstated.

74.     In response to the letter from the NAACP, on October 30, 2020, MSP informed both Officer Tribue and the NAACP that his police powers would be reinstated; that is, Officer Tribue's suspension was over and he could return to work.

75.     Under MSP policy, after his police powers were reinstated, MSP was required to issue Officer Tribue the official Personnel Order to return to work. This is an official document and order that would tell Officer Tribue to return to work, so that he would know which shifts to report to and the location. Without it, Officer Tribue could not return to duty, nor would Officer Tribue know where and when to report. However, MSP did not issue the Personnel Order.

76.     Officer Tribue repeatedly followed up with the MSP for the Personnel Order, which should have been issued to Officer Tribue within days of the October 30, 2020 letter. MSP did not issue the Personnel Order until December 10, 2020, 41 days later. There was no legitimate justification for this delay.

77.     Officer Tribue returned to his work duties on December 10, 2020, 301 days after being suspended on February 13, 2020.

Officer Tribue's Looses Income from Suspension

78.      As a result of MSP suspending Officer Tribue, he lost substantial income. While

on suspension for 301 days, MSP paid Officer Tribue his base salary in accordance with MSP

policy. However, Officer Tribue stopped earning the overtime pay, or the extra shift differential

pay from weekend shifts that he regularly earned when he was not suspended, except for a brief

period in the fall of 2020 when MSP asked Officer Tribue to pick up extra work from the

Licensing Division.

79.      In addition, Officer Tribue lost income from losing his secondary employment

working security. Like many MSP officers, Officer Tribue had secondary employment working

as a security officer. The requirements of these positions were that Officer Tribue was a law

enforcement officer in good standing. Because Officer Tribue was suspended, he was ineligible

for these jobs, and lost out on this valuable supplemental income. It was also humiliating for

Officer Tribue to have to inform his secondary employment about his suspension, and this

damaged Officer Tribue's professional reputation with these employers.

MSP's Trial Board for Officer Tribue

80.      MSP held Officer Tribue's Trial Board hearing on April 27, 2021.

81.      The Trial Board concluded that Officer Tribue should receive a punishment of ten

days without pay, which is a small fraction of the 301 days MSP kept Officer Tribue suspended.

82.      The punishment Officer Tribue received was within the disciplinary matrix, and a

significantly lighter punishment than what the MSP proposed.

83.      However, upon information and belief, no Caucasian officer has received a ten

day suspension for similar conduct.

Denied and Delayed Promotion

84.     MSP's extensive suspension of Officer Tribue delayed his ability to be promoted to Sergeant.

85.     Prior to Officer Tribue's suspension, he had earned the Non-Commissioned Officer of the Year for the Forestville Barrack, and also was selected to serve as Acting Sergeant. Based on Officer Tribue's record and honors, he was a strong candidate for a promotion.

86.     Officer Tribue applied to participate in the promotion process, even though he was on suspension. MSP held Officer Tribue's interview in early September 2020.

87.     Shortly thereafter, MSP published the rankings of the Sergeant Promotional List. Officer Tribue was ranked number 26 out of 96 officers competing for a promotion to Sergeant. Given that MSP had more than 26 slots open for promotion to sergeant rank, Officer Tribue should have received the promotion based on his ranking.

88.     However, MSP's decision to charge Officer Tribue outside of the disciplinary matrix prevented his promotion. MSP placed Officer Tribue in a "Catch-22" situation. Under MSP policy, Officer Tribue was not eligible for promotion to Sergeant if he accepted the proposed demotion. However, if Officer Tribue contested the demotion and proceeded to Trial Board to challenge the demotion, he could not be considered for a promotion due to the Trial Board charges he faced. Whatever option Officer Tribue picked, he could not get the promotion.

89.     MSP scheduled the promotions to take place in January 2021, and MSP would not hold Officer Tribue's Trial Board until April 2021. In short, MSP's decision to charge Officer Tribue outside the disciplinary matrix caused him to not receive a promotion he had earned.

90.     The MSP awarded the promotions on January 13, 2021. Officer Tribue was removed from consideration due to his pending Trial Board, and therefore did not get the

promotion. MSP notified Officer Tribue in advance of the January 13, 2021 that they were offering a promotion for the twenty-sixth candidate on the list, but due to his disciplinary charges he would not receive the promotion.

91.     Even after the Trial Board imposed the ten-day suspension on Officer Tribue, MSP did not grant him the promotion at the conclusion of the Trial Board.

92.     Under MSP policy, MSP should have awarded Officer Tribue the promotion because of his rank on the promotional list. The standard practice would be to issue Officer Tribue a Personnel Order with his promotion and assignment. However, MSP did not do this for Officer Tribue. Instead, MSP waited until the next promotion cycle to effectuate Officer Tribue's promotion, thus delaying his promotion. Because of Officer Tribue's prior ranking score of 26, at that point MSP had to award Officer Tribue the promotion. Upon information and belief, the MSP does not treat Caucasian officers who were on suspension this way when they were up for promotion based on their rank number.

93.     MSP ultimately awarded Officer Tribue his promotion to Sergeant in the September 2021 promotion cycle. However, even though a vacancy for a Sergeant position existed at the Forestville Barrack where Officer Tribue was stationed, MSP assigned him a Sergeant position in the Rockville Barrack, a significant commute from his home.

94.     As a result in the delay in promotion, Officer Tribue lost out on pay and the professional prestige of holding a Sergeant rank.

95.     In addition, because MSP requires officers to hold their rank for at least one year before being considered for future promotions, Officer Tribue's ability to receive promotions will be unjustly delayed going forward in his career with MSP.

MSP Does Not Subject Caucasian Officers to Similar Discipline

96.     MSP allows Caucasian officers the option of "getting time back" without treating them like the MSP treated Officer Tribue in February 2020.

97.     Caucasian officers leave early to "beat traffic" without issue. For example, at least one Caucasian officer leaves early on a regular basis multiple times a week to "beat traffic." In a leadership training class, Lt. Colonel Butler publicly stated that he knows troopers leave early to "beat traffic." Unlike Officer Tribue, MSP has not disciplined these Caucasian officers.

98.     During the course of Officer Tribue's suspension, a Caucasian officer in Officer Tribue's Barrack left his shift early, and got into a car accident.  MSP chose to merely write up this Caucasian officer without a suspension or investigation.

99.     In 2020, a Caucasian officer was charged with a Category E violation, which is more serious than the Category B and C violations that Officer Tribue was charged with. Category E violations fall under "very serious misconduct." This Caucasian officer who committed a serious offense received a 30 day suspension without pay, and a demotion, the same discipline MSP imposed on Officer Tribue for Category B and C violations.

100.    Another Caucasian officer received a speed camera violation nearly 30 miles outside of his work zone while he was on duty. The Caucasian officer was within an area he had not received permission to be in. Rather than charge him with false reporting or being outside of his patrol area without permission, MSP did not discipline him, and simply ordered him to pay the speed camera violation. In comparison, Officer Tribue had permission for his actions yet was suspended for 301 days.

101.    Two other Caucasian officers were regularly leaving their assigned areas early while still on duty. Both were involved in accidents in their assigned MSP cruisers while outside

of their assigned areas without permission. MSP did not investigate or charge either officer. Instead, MSP retroactively granted these Caucasian officers use of leave.

102.    Other Caucasian colleagues have failed to report for duty because they were under the influence of alcohol. MSP granted these Caucasian officers a personal leave day and they were not charged with an offense.

103.    Two Caucasian troopers used excessive force in apprehending a suspect, which resulted in the suspect needing facial reconstruction surgery. Neither trooper was charged with an offense.

104.    There is no legitimate, non-discriminatory reason for MSP's treatment of Officer Tribue.

**Plaintiff Matin Dunlap**

105.    Plaintiff Matin Dunlap has been subjected to discrimination and retaliation at the MSP including most recently being denied a transfer to Specialized Units.

106.    Officer Dunlap is a Black man.

107.    A Caucasian Corporal staged a banana on the windshield of Officer Dunlap's official vehicle, which was parked at the MSP facility and therefore almost certainly seen by many other MSP personnel. This was intended as, and understood by Officer Dunlap to be, a racist reference to Officer Dunlap, as a Black man, being a monkey: one of the most noxious and dehumanizing stereotypes against Black people. This has even been recognized as such by the Fourth Circuit Court of Appeals, *see, e.g.,* Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001); *Boyer-Liberto v. Fontainebleau Corp.,* 786 F.3d 264, 280 (4th Cir. 2015). This incident also received media attention.

108.     Officer Dunlap complained to the MSP's Office of Fair Practice, the internal office which handles complaints of discrimination at MSP. The Office of Fair Practice determined the Caucasian officer had in fact placed a banana on Officer Dunlap's car, and that it was "wrong" to do so, but that placing a banana on Officer Dunlap's car could not be tied to racism or discrimination.

109.     MSP did not discipline the Caucasian officer. Instead, MSP repeatedly promoted him, and made him a Lieutenant and a commander of an MSP Barrack where, according to MSP records, one-third of the troopers are Black. MSP has recently placed him in an elite Specialized Unit in the Criminal Enforcement Division.

110.     Following Officer Dunlap's complaint, MSP re-opened an already closed complaint that had been lodged against Officer Dunlap regarding a traffic stop, for which Officer Dunlap had already been cleared of any misconduct. Re-opening such an old, closed complaint violated MSP policy, but MSP allowed this action to move forward immediately after Officer Dunlap's discrimination complaint to the Office of Fair Practice.

111.     As a result, MSP placed Officer Dunlap on an unpaid suspension, and even charged him criminally, and kept him on suspension for three years. This stemmed from an alleged incident of misconduct that the MSP had already cleared him of before he complained about the racist conduct of the Caucasian officer.

112.     MSP did not substantiate the allegations against Officer Dunlap, and ultimately had to return him to work at the MSP in 2019. Since then, MSP has repeatedly continued to discriminate and retaliate against Officer Dunlap, including denying him assignments to Specialized Units.

113.    In particular, since December 2019, MSP has denied Officer Dunlap's applications to work in Specialized Units within the Criminal Enforcement Division, Licensing, Criminal Intelligence Section, and the Academy. Although Officer Dunlap has extensive experience in these fields, MSP has repeatedly selected less qualified Caucasian officers, some with little to no experience in these fields. MSP has never provided selection criteria, a ranking, or any other information about how and why MSP has repeatedly selected Caucasian officers with less experience and qualifications than Officer Dunlap for these Specialized Unit Positions. No legitimate, non-discriminatory justification exists for MSP's actions towards Officer Dunlap.

**Plaintiff Analisse Diaz**

114.    Plaintiff Analisse Diaz has been subjected to discrimination at the MSP including her termination.

115.    Officer Diaz is a Black Puerto Rican woman.

116.    Officer Diaz was a State Trooper with the Maryland State Police for eight years from January 2012 until MSP terminated her on October 24, 2019.

117.    Throughout her time at MSP, Officer Diaz faced a work environment permeated with racism. For example, Officer Diaz's First Sergeant told her that he did not think it was a "big deal" to say the "n-word" or words to that effect. On one occasion when Officer Diaz was cleaning something in the Barrack she was told that MSP should hire her as the cleaning staff. The comment was intended as, and understood by Officer Diaz to that Officer Diaz was more suited for janitorial work than work as an MSP officer because she was Hispanic. She was also told she was "acting like a bitch."

118.     Nonetheless, Officer Diaz was an exemplary employee and received praise for her dedication to the State Police force. Members of the MSP Drug Enforcement Unit, a Specialized Unit within MSP, asked Officer Diaz to work on specific missions for them both because of her skills as an officer and her fluency in Spanish. Officer Diaz began formally applying to join the Drug Enforcement Specialized Unit. However, MSP did not select Officer Diaz and instead selected Caucasian officers who were not better qualified, nor did they speak Spanish.

119.     Officer Diaz supervisor, Sgt. David Hooper, expressed displeasure at Officer Diaz receiving special assignments, and believed such assignments should be given to Caucasian men. When Officer Diaz was offered the opportunity to take a prestigious training, Sgt. Hooper blocked her from taking it, and expressed that such training should go to the Caucasian men in the Barrack.

120.     After being selected for the special training, Sgt. Hooper and Officer Diaz's Corporal, began to retaliate against Officer Diaz, including unwarranted criticism of her performance and writing her up, while not doing the same to Caucasian officers.

121.     Next, MSP gave Officer Diaz a poor performance review that would bar her from participating in the upcoming promotional cycle, even though she was a strong candidate for a promotion. The alleged reason for the poor performance rating was that Officer Diaz had poor monthly statistics, such as number of traffic stops. However, other Caucasian troopers in her group had similar monthly statistics, and these Caucasian troopers did not receive poor performance reviews.

122.     Officer Diaz appealed the poor review. In response management escalated retaliation, including placing her on a PIP, suspending her overtime privileges, and scrutinizing her work. MSP did not do the same to Caucasian troopers. In January 2018, Sgt. Hooper referred

her to the Internal Affairs Department for discipline. MSP does not refer Caucasian officers to the Internal Affairs Department for similar or worse conduct.

123.    In February 2018, Officer Diaz made a complaint of discrimination to the Office of Fair Practice. Shortly thereafter, MSP notified Officer Diaz that the MSP Office of Internal Affairs was placing her under investigation. MSP suspended Officer Diaz without pay while the investigation was conducted.

124.    On April 18, 2018, the Office of Fair Practice issued Officer Diaz a letter stating that they had found no probable cause for her allegations of discrimination. While it only took MSP less than ten weeks to determine that Officer Diaz's allegation of discrimination were to be dismissed, it took MSP nearly eighteen months to investigate Officer Diaz.

125.    The Internal Affairs Department added additional charges, and ultimately proposed terminating her.  While other Caucasian officers make the same type of low level mistakes Officer Diaz was accused to making, MSP does not propose terminating them.

126.     Officer Diaz declined to accept termination as a penalty, and so her case proceeded to a Trial Board. MSP ultimately held a Trial Board on June 3-4, 2019. On September 24, 2019, the Trial Board issued a written report recommending that Officer Diaz be terminated. The decision became official on October 22, 2019, when the Superintendent reviewed, concurred, and signed the Trial Board report. MSP notified Officer Diaz of the decision on October 24, 2019.

127.    MSP does not terminate Caucasian officers for similar or worse conduct. For example, while working for the MSP, Officer Diaz witnessed multiple Caucasian, male counterparts be charged with drunk driving and serious accidents, including flipping vehicles.

These colleagues were not terminated. Instead, MSP merely transferred them. Another Caucasian officer left his gun at a convenience store, and he was not terminated.

128.    No legitimate, non-discriminatory reason existed for MSP's actions towards Officer Diaz.

## CLASS ACTION ALLEGATIONS

129.    In accordance with Federal Rule of Civil Procedure 23, Officer Tribue, Officer Diaz and Officer Dunlap assert claims for MSP's violations of Section 1983.

130.    Officer Tribue, Officer Diaz and Officer Dunlap bring these claims on behalf of themselves and all Officers of Color (including Black, Hispanic, and Asian, South Asian and Middle Eastern officers) who were denied promotions and/or disciplined (including charges, investigations, suspensions, demotions, and/or terminations), and otherwise subject to discrimination by the MSP at any time from October 24, 2019 to the present.

131.    Plaintiffs assert the following class-wide violations of Section 1983: MSP's disciplinary policies constitute disparate treatment and evince discriminatory intent as the MSP routinely imposes excessive discipline on Officers of Color as compared to similarly situated Caucasian officers and this discipline is effectuated through MSP's centralized Internal Affairs Department.

132.    The proposed class is easily ascertainable. The number and identity of class members may be determined from MSP records. In fact, MSP maintains records of all promotions and disciplinary charges brought, their outcome, and these records include the data about the officer's race.

133.    The proposed class meets all the requirements of Federal Rule of Civil Procedure 23(a) and (b)(3):

a.      Numerosity: upon information and belief, the proposed class is greater than 100 individuals. This class size is so numerous that joinder of all class members is impracticable. In addition, the disposition of these individuals' claims as a class will benefit both the parties and the Court.

b.      Commonality: Plaintiffs and members of the proposed class they seek to represent have all been harmed by MSP's policy in that they have been denied promotions and/or experienced excessive discipline, been denied opportunities for advancement, and/or been terminated because of their race/color/national origin. The common questions in this case include, but are not limited to: whether MSP's policy and/or its discipline practices treated, and continue to treat, Officers of Color differently than Caucasian officers in violation of Section 1983.

c.      Typicality: Plaintiffs and the members of the proposed class have been subject to the same unlawful policies, practices, and procedures and thus have suffered similar harms. All putative class members have been subject to MSP's promotional and/or disciplinary policies and have experienced excessive discipline and other negative employment consequences as a result. Plaintiffs' claims are typical of the claims that could be brought by any member of the class, and the relief sought is typical of the relief that could be sought by any member of the class in a separate action.

d.      Adequacy of representation: Plaintiffs are able to fairly and adequately protect the interests of all members of the class, as they are challenging the same policy and practices as the class as a whole, and there are no known conflicts of interest between Plaintiffs and the members of the proposed class. Plaintiffs have retained counsel who are

experienced and competent in employment discrimination claims and in complex class-action litigation.

e.     Predominance and superiority: the common question identified above predominate over any individual issues. A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of all class members is impracticable. Class action treatment will permit a large number of similarly situated persons to prosecute their claims in a single forum simultaneously, efficiently, and without the necessary duplication of effort and expense that numerous individual actions involve. Because the losses, injuries, and damages suffered by each individual class member are small in the sense pertinent to class action analysis, the expense and burden of individual litigation would make it extremely difficult or impossible for the individual class members to redress wrongs done to them.

f.     Likewise, important public interests will be served by addressing the matter as a class action. Prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent and/or varying adjudications, establishing incompatible standards of conduct for MSP and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court may fashion methods to efficiently manager this action as a class action.

g.     Pursuit of this action on behalf of a class will provide the most efficient mechanism for adjudicating the claims of Officer Tribue, Officer Diaz and Officer Dunlap and the members of the proposed class.

29

**Count I.      Race Discrimination in Violation of Fourteenth Amendment and the 1866 Civil Rights Act, 42 U.S.C. § 1983 ("Section 1983")  on behalf of all Plaintiffs and others similarly situated**

134.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

135.     By the actions described above, among others, Defendant MSP discriminated against the Class Representatives and members of the Class on the basis of their race, color, and/or national origin in violation of the 1866 Civil Rights Act, 42 U.S.C. § 1983 ("Section 1983") .

136.     The Fourteenth Amendment to the United States Constitution guarantees citizens equal protection of the laws of the United States, with violations thereof giving rise to claims for relief under 42 U.S.C. § 1983.

137.     42 U.S.C. § 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the United States Constitution and laws" by persons acting under the color of law. The right to be free from racial discrimination in employment and retaliation for assertion of one's civil rights were both clear and well-established rights, known to Defendant, the MSP, in this action throughout the time period of the allegations of this Complaint.

138.     By the acts and omissions described above, Defendant, while acting under color of state law, has engaged in a longstanding pattern or practice of discriminating against Officers of Color by, *inter alia*, maintaining and allowing a hostile work environment, subjecting said officers to disparate discipline including but not limited to discrimination in the investigatory/disciplinary process, the imposition of unwarranted disciplinary penalties, retaliation against officers complaining of discrimination suffered by themselves or others, and denying promotions to Officers of Color based on race, color, and/or national origin.

139.    Defendant violated the equal protection guarantees of the Fourteenth Amendment by discriminatorily denying Plaintiffs preferable assignments, preferred locations, training opportunities and overtime for which the Plaintiffs were qualified and which similarly situated Caucasian officers were routinely granted, giving rise to their claims for relief under 42 U.S.C. § 1983.

140.    The Defendant has, by the actions described herein, acted under the color of state law to discriminate against Plaintiffs and their members on the basis of race, color, and/or national origin, thereby depriving them of rights, privileges, and immunities secured to them by the Constitution and laws of the United States and the State of Maryland, and in direct violation of the Fourteenth Amendment to the United States Constitution.  Such injury has been and will continue to be irreparable.

141.    As a direct and proximate result of these acts, Plaintiffs and their members have been and continue to be deprived of their civil rights, suffered and continue to suffer loss of employment, loss of income, race, color, and/or national origin-based discrimination in job advancement, loss of other employment benefits, and have suffered and continue to suffer distress, humiliation, great expense, embarrassment, and damage to their reputations.

142.    The actions of Defendant, in depriving Plaintiffs and their members of their constitutional and civil rights, were willful and malicious and constitute a continuing violation of the Fourteenth Amendment.

143.    At all times herein mentioned, the Defendant maintained a series of customs, policies and practices that proximately caused and continue to cause and that were likely to lead and continue to lead to the violation of Plaintiffs' and their class members' constitutional and

civil rights.  These acts, omissions, customs, policies and practices included, among others, the following:

a.  Defendant's continuing failure to stop, correct, prevent and eliminate discriminatory disciplinary practices and other discriminatory conditions of employment related thereto.  This discrimination was known to or should have been known to the Defendant at all times mentioned herein;

b.  The continuing refusal and/or failure on the part of the Defendant and its policy-making leaders, to fully and adequately stop, correct, or discipline Caucasian officers who have engaged in acts of discrimination, including displays of racist images, racist slogans, and discriminatory treatment of employees;

c.  Defendants have engaged in and continue to engage in acts of retaliation against Officers or Color who complain of discrimination and racism within and by the MSP and/or support officers who complain of discrimination and racism within and by the MSP;

d.  Defendants maintain, facilitate and condone a severe or pervasive hostile work environment that is so hostile as to alter the terms and conditions of employment for Officers of Color; and

e.  Defendants facilitate an environment where Officers of Color who speak out against racism and/or complain about discrimination within the MSP are denied promotions and other positions to enhance their careers in the MSP.  Instead, Officers of Color who complain about discrimination are marginalized and given less prestigious positions within the MSP.

144.     As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of Section 1983, the Class Representatives and members of the Class have suffered and continue to suffer harm for which they are entitled to an award of damages and other relief to make them whole to the greatest extent permitted under the law.

145.     In addition, as the discrimination outlined in this Complaint is ongoing and continuous, the Class Representatives and members of the Class are entitled to injunctive relief.

**Count II.       Race Discrimination in Violation of the First Amendment and the 1866 Civil Rights Act, 42 U.S.C. § 1983 ("Section 1983")  on behalf of all Plaintiffs and others similarly situated**

146.     Plaintiffs re-allege and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

147.     By the acts and omissions described above, Defendant, while acting under color of state law, have maintained and continue to maintain an employment policy and continuing practice of willful and intentional retaliation against those employees, Plaintiffs included, who raise objections to the MSP's racially discriminatory employment and policing practices, thereby depriving Plaintiffs of their rights to petition the government for redress of grievances, as guaranteed by the First and Fourteenth Amendments to the United States Constitution.

148.     Such retaliatory acts and omissions include, but are not limited to, the facts that Defendant regularly instigate unfounded and pretextual disciplinary charges against; harass; disqualify from eligibility for promotion; refuse to promote; demote; transfer to undesirable positions; and otherwise engage in adverse employment actions toward individuals who petition the government to address and remedy racial discrimination within MSP.

149.     Such petition and complaints by Plaintiffs include, but are not limited to, informal complaints to supervisors regarding racism in the workplace (including racism in hiring, promotions, discipline, assignments, disparate treatment, and racist symbols); complaints to

33

MSP's Office of Fair Practice; complaints made during the course of the disciplinary process and Trial Board;  complaints to the EEOC and/or Maryland state and/or local Fair Employment Practice Agencies (FEPAs); complaints to elected officials; comments to the media about racism at MSP.

150.    As a direct and proximate result of the policy and continuing practice of retaliation intentionally maintained by Defendant, Plaintiffs have been and continue to be deprived of their civil rights, they have suffered and continue to suffer retaliation for exercise of First Amendment rights, harassment, and losses of work and wages, which collectively have caused them severe emotional distress, pain, and humiliation, in addition to actual wage losses.

## Prayer for Relief

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the following relief:

A.  Declaratory relief, including but not limited to a declaration that MSP violated the laws of the United States, including Section 1983, the First Amendment and the Fourteenth Amendment to the Constitution;

B.  Injunctive relief, including but not limited to revision of MSP's disciplinary and promotion policies to comply with Section 1983 and the appointment of an independent monitor to oversee the MSP's disciplinary and promotion policies and practices;

C.  Grant such additional equitable relief as is proper and just, including but not limited to, requiring Defendant to immediately enter into a plan to eliminate the practices noted in this Complaint at MSP;

D.  Compensation for loss of income, including back pay, front pay, and benefits;

E.  Compensation for emotional distress damages, including but not limited to damage to professional reputation;

F.  Immediately rescind and expunge any and all discipline issued to Plaintiffs and their class members from any and all files and records of the MSP;

G.  Immediately reinstate any and all Plaintiffs and their class members who were wrongfully terminated from employment due to the discriminatory acts complained of herein;

H.  Immediately offer promotions to all Plaintiffs and class members who they have failed to promote due to discrimination, retaliation and the creation and maintenance of a severe and hostile work environment;

I.  Give priority to Officers of Color in assignment to Specialized Units whose previous transfers were denied due to discrimination, retaliation and/or the creation and maintenance of a severe and hostile work environment;

J.  Pre-judgment and post-judgment interest at the highest lawful rate;

K.  Costs incurred, including reasonable attorneys' fees to the extent allowable by law; and

L.  Such other relief as the Court deems just and proper.

## **<u>Jury Demand</u>**

Plaintiffs demand a jury trial on the matters alleged herein.

Dated:  October 24, 2022                                  Respectfully Submitted,

JOSEPH, GREENWALD & LAAKE, P.A.

__/S/ MICHAL SHINNAR_____
Michal Shinnar (Bar No. 19757)

*Senior Counsel*
mshinnar@jgllaw.com


__   /S/ JAY HOLLAND_____
Jay P. Holland (Bar No. 06015)
*Principal*
Jholland@jgllaw.com
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
301.220.2200 (T)
301.220.1214 (F)


BACHMAN LAW

__   /S/ ERIC BACHMAN_____
Eric Bachman  (Bar No. 16325)
4800 Hampden Lane,Suite 200
Bethesda, MD 20814
(202) 769-1681 (T)
(240) 303-8091 (F)
ebachman@ebachmanlaw.com