## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Southern Division)

**Byron Tribue**
c/o 1201 Reisterstown Rd.
Pikesville, MD 21208[1]

**Matin Dunlap**
c/o 1201 Reisterstown Rd.
Pikesville, MD 21208

**Analisse Diaz**
2907 Siwanoy Dr.
Edgewood, MD 21040

**On behalf of themselves and others
similarly situated**

      **Plaintiffs,**

  v.

**State of Maryland**
Anthony G. Brown
Maryland Attorney General
200 St. Paul Place
Baltimore, MD 21202

**Col. Roland L. Butler, Jr.**
c/o 1201 Reisterstown Rd.
Pikesville, MD 21208

**Col. William M. Pallozzi**
4309 College Ave.
Ellicott City, MD 21043

**James E. Hock, Jr.**
c/o 1201 Reisterstown Rd.
Pikesville, MD 21208

**Col. Woodrow W. Jones III**
2051 Oak St.

Case No.: 8:22cv02732

---

[1] As current service law enforcement officers for the Maryland State Police, the home addresses of Plaintiffs Byron Tribue, Matin Dunlap, and Defendants Butler and Hock are not publicly listed in this Complaint. The other Plaintiffs addresses are known to Defendant.

Cambridge, MD 21613

**Defendants.**

## FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs, Byron Tribue, Analisse Diaz and Matin Dunlap, on behalf of themselves and others similarly situated, by and through the undersigned counsel, file this lawsuit against Defendant the State of Maryland, for the actions of its agency and agents of the Maryland State Department of Police ("MSP"), ("Defendant"), as well as Colonel Roland L. Butler, Jr., Colonel William M. Pallozzi , James E. Hock, Jr., and Colonel Woodrow W. Jones III (collectively "Individual Defendants") and state as follows:

## NATURE OF THE ACTION

1.      Plaintiff Tribue, Plaintiff Diaz, Plaintiff Dunlap, and other similarly situated Officers of Color bring this civil class action to recover damages and civil penalties arising from unlawful employment practices by the Defendants, and to obtain injunctive relief to stop this ongoing discrimination. MSP and the Individual Defendants have engaged in a pattern or practice of systemic discrimination against Officers of Color versus Caucasian officers, including:

> a.  Maintaining centralized disciplinary policies and procedures that disparately treat Officers of Color by imposing unfounded, unwarranted and overly severe and disparate penalties, including suspensions, terminations, demotions, transfers, and denials of promotions and other advancement opportunities;

b.  Maintaining centralized policies and procedures for promotions that disparately deny Officers of Color promotions;

c.  Intentionally discriminating against Officers of Color through disparate treatment of these officers through disciplinary measures and denial of promotions;

d.  Maintaining and allowing a hostile work environment, including, but not limited to, subjecting Officers of Color to racist comments and symbols such as using a paper training dummy at a MSP shooting range with a black face and "Afro  wig" for officers to shoot at; making a commemorative coin with the phrase "Make Waldorf Great Again;" commencing unwarranted and unfounded investigatory/disciplinary proceedings against Officers of Color; imposing overly severe disciplinary penalties; transferring Officers of Color to less favorable and/or more dangerous assignments and shifts; assigning Officers of Color to positions that require lengthy commutes; denying Officers of Color overtime opportunities; and retaliating against Officers of Color who have opposed discrimination.

2.    The disparate discipline against Officers or Color as compared to Caucasian officers is enacted and authorized by the MSP Internal Affairs Department, which is the centralized office of the MSP tasked with assessing potential officer misconduct, determining whether to propose discipline against an officer, and deciding the type and degree of discipline to propose for an officer, and by the MSP Penalty Assessment Review Committee (PARC). The State of Maryland vests the PARC with the jurisdiction to recommend punishments for all

alleged infractions that are listed as Category D and/or Category E offenses in the MSP Disciplinary Matrix. Category D and/or Category E offenses are the highest level offenses under the MSP Disciplinary Matrix, and can result in termination. The PARC also has the jurisdiction to review other disciplinary cases the Chair of the PARC deems appropriate.

3.     The disparities in the promotional opportunities for Officers of Color versus Caucasian officers are carried out through MSP's centralized promotional process and its promotional ranking system, which the Individual Defendants supervised and ratified.

4.     The Defendants employ a further policy of retaliating against Officers of Color who complain about discrimination, including disparate discipline as compared to Caucasian officers. The Defendants treat Officers of Color who report discrimination less favorably than Caucasian officers who report discrimination.

5.     The disparate discipline Plaintiffs faced resulted in terminations, lost promotions, and demotions, and it also caused Plaintiffs harms including losing pay; suffering damages to their professional reputation; lost supplemental employment; lost retirement benefits; and personal pain and suffering.

## JURISDICTION AND VENUE

6.     This Court has original jurisdiction over this Complaint pursuant to 28 U.S.C. § 1331 because those claims arise under the United States Constitution and laws of the United States.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)-(2) because all of the events, acts, and/or omissions giving rise to Plaintiffs' claims occurred in the State of Maryland.

8.     The amount in controversy as set forth in the complaint exceeds $75,000.00 in an amount to be determined by the jury.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.    Plaintiff Tribue timely filed his Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and cross-filed with the Maryland Commission on Civil Rights on November 11, 2021.

10.    Plaintiff Tribue filed a supplement to his initial Charge of Discrimination on August 12, 2022.

11.    Plaintiff Tribue was issued his Notice of Right to File Suit on September 1, 2023 and filed this Complaint within ninety (90) days of receipt, and this Complaint is being timely filed within the statute of limitations.

12.    All statutory prerequisites for bringing this action have been timely satisfied.

## PARTIES AND ENTITIES

13.    Plaintiffs are all current or former uniformed police officers of the MSP who are persons of color and bring this case on behalf of themselves and other similarly situated Officers of Color at MSP, including Black, Hispanic, Asian-American, South Asian and Middle Eastern officers. All Plaintiffs have been subject to discrimination during their employment at the MSP on the basis of their race, color, and/or national origin.

14.    Plaintiff, Byron Tribue, is a Black man residing in Maryland. At all relevant times Officer Tribue was an employee of the MSP, and stationed in the MSP's Barracks in Prince George's County, MD and Montgomery County, MD.

15.    Plaintiff, Analisse Diaz, is a Black Puerto Rican woman residing in Maryland.  At all relevant times Officer Diaz was an employee of the MSP.

16.    Plaintiff, Matin Dunlap, is a Black man residing in Maryland.  At all relevant times Officer Dunlap was an employee of the MSP.

17.    Defendant State of Maryland acts through the MSP, officially the Maryland Department of State Police, which is the official state police force for the State of Maryland and operates under the color of law of the State of Maryland. MSP is a State agency, not an independent corporate entity. The MSP is headquartered at 1201 Reisterstown Road, Pikesville, MD 21208 located in unincorporated Baltimore County.

18.    Defendant Roland L. Butler, Jr. is the current Secretary of State Police for MSP, a position he has held since March 31, 2023. Defendant Butler served as Acting Secretary of State Police from February 23, 2023 to March 30, 2023, and as the Chief of MSP Field Operations Bureau, from 2020 to February 22, 2023. As the Chief of the Field Operations Bureau, Defendant Butler also served as a member of the MSP Penalty Assessment Review Committee (PARC). At all relevant times, Defendant Butler worked in a supervisory capacity over Plaintiffs and the other individuals named in this Complaint. Defendant was aware of, and deliberately indifferent to, multiple instances of discrimination in violation of Plaintiffs' constitutional rights. In addition to awareness of conduct that interfered with individual Plaintiffs' constitutional rights, Defendant was aware of publicized events of mass discrimination, detailed *infra*, and failed to properly respond within his supervisory capacity. Defendant's inaction allowed for the continued discrimination towards Officers of Color.

19.    Defendant Col. William M. Pallozzi is the former Secretary of State Police for MSP, a position he held between 2015 to 2020. At all relevant times, Defendant Pallozzi worked in a supervisory capacity over Plaintiffs and the other individuals named in this Complaint. Defendant was aware of, and deliberately indifferent to, multiple instances of discrimination in violation of Plaintiffs' constitutional rights. In addition to awareness of conduct that interfered with individual Plaintiffs' constitutional rights, Defendant was aware of publicized events of mass

discrimination, detailed *infra*, and failed to properly respond within his supervisory capacity. Defendant's inaction allowed for the continued discrimination towards Officers of Color.

20.    Defendant James E. Hock, Jr. is the Chief of Staff for MSP. As the Chief of Staff, he serves as the Chair of the Penalty Assessment Review Committee (PARC). At all relevant times, Defendant Hock worked in a supervisory capacity over Plaintiffs and the other individuals named in this Complaint. Defendant was aware of, and deliberately indifferent to, multiple instances of discrimination in violation of Plaintiffs' constitutional rights. In addition to awareness of conduct that interfered with individual Plaintiffs' constitutional rights, Defendant was aware of publicized events of mass discrimination, detailed *infra*, and failed to properly respond within his supervisory capacity. Defendant's inaction allowed for the continued discrimination towards Officers of Color.

21.    Defendant Col. Woodrow W. Jones III is the former Secretary of State Police for MSP, a position he held between 2020 to 2022. At all relevant times, Defendant Jones worked in a supervisory capacity over Plaintiffs and the other individuals named in this Complaint. Defendant was aware of, and deliberately indifferent to, multiple instances of discrimination in violation of Plaintiffs' constitutional rights. In addition to awareness of conduct that interfered with individual Plaintiffs' constitutional rights, Defendant was aware of publicized events of mass discrimination, detailed *infra*, and failed to properly respond within his supervisory capacity. Defendant's inaction allowed for the continued discrimination towards Officers of Color.

22.    The claims against the Individual Defendants arise under 42 U.S.C. 1983, but not under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1, *et seq*., nor under the Maryland Human Relations Act, Md. Code, State Gov't §§ 20-601 *et seq*. ("MHRA").

## FACTS COMMON TO ALL COUNTS

### Policies Governing Plaintiffs' Employment at MSP

23.     MSP is bound by the Fourteenth Amendment to the United States Constitution, which guarantees citizens equal protection of the laws of the United States, with violations thereof giving rise to claims for relief under 42 U.S.C. § 1983. Section 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the United States Constitution and laws" by persons acting under the color of law.  The right to be free from racial discrimination in employment and retaliation for assertion of one's civil rights are both clear and well-established rights that employees of MSP have and are well known by MSP.

24.     Individual agents of MSP are required to abide by Section 1983, and are subject to liability within their individual capacities. Individuals may be held liable under Section 1983 without direct discrimination towards another through what is widely recognized in the Fourth Circuit as 'supervisory liability.'

25.     MSP is required to follow Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1, *et seq.* Title VII makes it unlawful to discriminate against employees on the basis of their race, color, and/or national origin, and makes it unlawful to retaliate for making complaints about any of the above. Title VII prohibits conduct that causes unlawful disparate treatment as well as a disparate impact on employees.

26.     MSP is required to follow the Maryland Human Relations Act, Md. Code, State Gov't §§ 20-601 et seq. ("MHRA"), which makes it unlawful to discriminate against employees on the basis of their race, color, and/or national origin, and makes it unlawful to retaliate for making complaints about any of the above.

27.     MSP represents to its employees that "[i]t is the policy of the Maryland Department of State Police to afford equal employment opportunity to qualified individuals regardless of their sex, age, ancestry, race, color, creed, gender Identity/Expression, national

origin, religious affiliation belief or opinion, sexual orientation, marital status, genetic information or disability." And that "[a]ny form of harassment or retaliation for reporting discrimination will not be tolerated. Threats or acts of retaliation against witnesses testifying in regard to discrimination or harassment are likewise prohibited."

### MSP's Pattern or Practice of Discrimination Against Officers of Color

28.     Plaintiffs and others similarly situated are current and former MSP officers who are all persons of color, including Black, Hispanic, Asian-American, South Asian and Middle Eastern officers. As detailed herein, Plaintiffs were all subject to a pattern or practice of the Defendants to discriminate against Officers of Color. This includes unduly harsh discipline, including demotions, and termination, as well as systematically denying Officers of Color promotions, and subjecting officers to discrimination and harassment.

29.     On July 15, 2022, the United States Department of Justice announced that "it has opened a civil pattern or practice investigation into the Maryland Department of State Police . . . under Title VII of the Civil Rights Act of 1964" regarding whether the MSP has engaged in racially discriminatory hiring and promotion practices.

### *Disparate Discipline*

30.     The Defendants have a pattern or practice of exacting unduly harsh and excessive discipline upon Officers of Color to which they do not subject Caucasian officers. The Defendants have a pattern or practice of disciplining Officers of Color for minor, negligible, and/or non-existent violations of MSP policies. These disciplinary actions exceed the recommended discipline for such alleged infractions as set forth in the MSP disciplinary matrix and policies. The Defendants have a pattern or practice of taking lengthy times to investigate, charge, and process disciplinary actions against Officers of Color, time which is not justified by

the subject matter, facts, or policy, resulting in extending the lost income and/or reputational harms to Officers of Color in the disciplinary process.

31.    The Defendants do not subject similarly situated Caucasian officers to similar discipline for comparable or even more severe offenses, and in fact has a pattern or practice of declining to charge or investigate Caucasian officers for known and/or alleged misconduct.

32.    The disparate discipline Plaintiffs faced include actions from the MSP Internal Affairs Division ("IAD"), which is the centralized office of the MSP that is tasked with assessing potential officer misconduct, determining whether to propose discipline against an officer, and deciding the type and degree of discipline to propose for an officer. The Individual Defendants have supervisory authority over the IAD.

33.    The disparate discipline Plaintiffs faced results in similarly situated Plaintiffs to not only experience terminations, lost promotions, and demotions, it also caused Plaintiffs harms including losing pay; suffering damages to their professional reputation; lost supplemental employment; lost retirement benefits; and personal pain and suffering.

34.    The Maryland General Assembly has expressed concerns about racial discrimination and lack of diversity within MSP. The Maryland General Assembly then directed MSP to study discrimination-related issues within MSP, including "barriers to diverse employment within its ranks," a study "of the disciplinary actions for civilian and sworn personnel over the past three years[,]" and the "number of reported incidents of racially insensitive behavior among departmental personnel."

35.    Each of the Individual Defendants had actual and/or constructive knowledge that their subordinates, including but not limited to the Internal Affairs Division, engaged in discriminatory conduct against Officers of Color that posed a pervasive and unreasonable risk of

injury. This knowledge came from, among other things, their supervision of the centralized IAD, which imposes discipline, the repeated complaints about unequal discipline imposed on Officers of Color, as well as the MSP's own data demonstrating were disciplined at a higher rate and more severely than Caucasian officers.

36.    Likewise, each of the Individual Defendants' response to this knowledge of discriminatory conduct against Officers of Color was so inadequate as to show deliberate indifference or tacit authorization of the conduct.

37.    As a result, each of the Individual Defendants' inaction caused the constitutional injuries to the Plaintiffs and the class they seek to represent.

### *Discrimination in Promotions and Hiring*

38.    MSP hires significantly smaller numbers of minority officers compared to Caucasian officers. Upon information and belief, the demographic composition of officers at MSP is approximately as follows:

| Year | Total Officers | Minorities | Caucasian | Unknown/ Declined to State | Percent Minority | Percent Caucasian |
|------|---------------|-----------|-----------|---------------------------|-----------------|-------------------|
| 2022 | 1426 | 230 | 1189 | 7 | 16.13% | 83.3% |
| 2021 | 1477 | 244 | 1227 | 6 | 16.52% | 83.0% |
| 2020 | 1456 | 234 | 1214 | 8 | 16.07% | 83.4% |

39.    The United States Census Bureau records that per the 2020 decennial census, the population of Maryland is 48.7% Caucasian, compared to the approximately 83% of Caucasian officers at MSP. Moreover, according to the MSP's data, between 2015 and 2021, the percentage of Black sworn officers has decreased. There is no legitimate, non-discriminatory reason for these disparities.

40.    The Defendants also engage in a systemic pattern or practice of denying Officers of Color promotions, resulting in disproportionally fewer Officers of Color within many ranks of the MSP. MSP has a centralized process for evaluating officers for promotions. The disparity in promotions for Officers of Color cannot be explained by disparities in education, performance, experience, or any other legitimate, non-discriminatory reason.

41.    The MSP allows for promotion evaluations every two years. MSP further requires that officers be in their position for one year before they are eligible for promotions in the two-year cycle. This is not standard practice across the nation in other police departments. Other jurisdictions allow for much greater flexibility in their promotional structure, which helps mitigate any disparity in promotions based on race, color, and/or national origin.

42.    To qualify for a promotion, MSP looks at three factors: a written test; resume, and oral interview.

43.    The first factor is the written test, which requires a trooper (1) to score above a 60 and (2) to be within the top scores for that testing cycle.

44.    The second component of the MSP promotional process is the "resume." The resume is a list/excel sheet that exclusively lists the trainings the officer has completed, and the number of hours of each training.

45.    Troopers within Specialized Units have many more training opportunities and thus often receive a higher score on the resume portion of the test. Patrol officers, on the other hand, typically have less training opportunities due to their workload and hours, and therefore frequently receive a lower score on the resume component.

46.    The Defendants have a pattern or practice of denying Officers of Color placement in Specialized Units. Officers of Color are represented in Specialized Units at a

disproportionally low rate. This contributes to MSP's systemic disadvantages to Officers of Color in the promotional process.

47.     MSP's process for being assigned to a Specialized Unit is highly subjective and therefore subject to high levels of bias. To gain access to a Specialized Unit, an officer must appear before a panel of three superior officers within their unit. The specialized unit panel then scores each applicant. No objective standards exist except that one must be an officer and have no internal investigations open against them.

48.     The requirement that officers must have no internal investigations open against them disproportionally disadvantages Officers of Color due to the Defendants' pattern or practice of disproportionally disciplining Officers of Color for minor infractions, and also not disciplining Caucasian officers for similar or worse infractions. In addition, this requirement deters qualified Officers of Color from even applying to Specialized Units.

49.     After the interviews, MSP announces who has been selected to the Specialized Unit. Applicants to Specialized Units only hear if they were selected, and MSP does not inform them of their scores or how they ranked among their peers.

50.     Service in a Specialized Unit is not only an advantage for promotions, the Specialized Units provide officers better terms and conditions of employment given that the shifts are not rotating and officers within the unit are not on call.

51.     The last component of MSP's scoring for promotions is the oral interview. The oral interview is also a heavily subjective test. Officers of Color generally receive lower scores with no explanation.

52.     As a result, in the final scores, despite their excellent performance and credentials, Officers of Color are disproportionately not promoted within MSP, as compared to Caucasian Officers.

53.     Even the Officers of Color who receive high scores on the overall ranking are not promoted, including due to pretextual, discriminatory and punitive disciplinary measures taken against them, which impede their ability to be promoted.

54.     Each of the Individual Defendants had actual and/or constructive knowledge that their subordinates engaged in discriminatory and/or retaliatory conduct against Officers of Color that posed a pervasive and unreasonable risk of injury. This knowledge came from, among other things, the repeated complaints about promotion discrimination regarding Officers of Color, and/or the MSP's own data demonstrating that Officers of Color were underrepresented in leadership positions.

55.     Likewise, each of the Individual Defendants' response to this knowledge of discriminatory conduct against Officers of Color was so inadequate as to show deliberate indifference or tacit authorization of the conduct.

56.     As a result, each of the Individual Defendants' inaction caused the constitutional injuries to the Plaintiffs and the class they seek to represent.

### _Retaliation_

57.     MSP has a stated policy of non-discrimination, and asks employees to report any allegations of discrimination to the MSP Office of Fair Practice. MSP is also bound by laws which prohibit retaliating against employees who make protected complaints of discrimination. However, the Defendants routinely and systematically fail to protect Officers of Color who make protected complaints of discrimination.

58.     When Officers of Color complain of discrimination, MSP's Office of Fair Practice has a pattern or practice of concluding that no discrimination has occurred, despite evidence presented, as well as a pattern or practice of ignoring and overlooking examples of overt racism. Further, the Individual Defendants have supervisory authority over the Office of Fair Practices.

59.     Upon information and belief, at least one employee of the Office of Fair Practice has quit in protest of these systemic failures in treating Officers of Color fairly.

60.     In addition, the Defendants have a pattern or practice of retaliating against Officers of Color for complaining about, or proposing discipline for, Caucasian officers who commit misconduct.

61.     Each of the Individual Defendants had actual and/or constructive knowledge that their subordinates engaged in discriminatory and/or retaliatory conduct against Officers of Color that posed a pervasive and unreasonable risk of injury. This knowledge came from, among other things, their supervisory authority over the Office of Fair Practices, the repeated complaints about discrimination and/or retaliation regarding Officers of Color; the MSP's own data demonstrating that Officers of Color were disciplined at a higher rate and more severely than Caucasian officers.

62.     Likewise, each of the Individual Defendants' response to this knowledge of retaliatory conduct against Officers of Color was so inadequate as to show deliberate indifference or tacit authorization of the conduct.

63.     As a result, each of the Individual Defendants' inaction caused the constitutional injuries to the Plaintiffs and the class they seek to represent.

***Harassment and Disparate Treatment***

64.    The Defendants have a pattern or practice of subjecting Officers of Color to racist comments and symbols such as using a paper training dummy at a MSP shooting range with a black face and "Afro  wig" for officers to shoot at, making a commemorative coin with the phrase "Make Waldorf Great Again." The Defendants have a pattern or practice of failing to take corrective action about such harassment.

65.    For example, on or around June 2, 2020, a Caucasian Officer, Jason Oros, shared via text a racist, vulgar, highly offensive meme barely a week after George Floyd's murder. The meme depicted George Floyd's death; however, Officer Derek Chauvin was replaced by a naked Black man who sat atop Floyd with his genitalia on Floyd's neck. Oros' text, which was shared with his superiors, was captioned "Too soon?" with a shrugging emoji.

66.    MSP began an investigation against Oros, which lasted three years and did not result in any criminal action against Oros. Ultimately, in July 2023, MSP did not take disciplinary actions against Oros, and instead allowed Oros to retire with full benefits. The Individual Defendants had supervisory authority over Oros. Each of the Individual Defendants had actual and/or constructive knowledge that Oros engaged in his open discrimination, and that Oros was allowed to remain at MSP, and that Oros was being provided preferential treatment compared to that MSP provides to Officer of Color.

67.    Likewise, between 2018 to 2023, MSP received approximately 69 "reported incidents of racially insensitive behavior," none of which were deemed substantiated by the Defendants.

68.    In addition, the Defendants have a pattern or practice of discriminating against Officers of Color in the terms and conditions of their employment. This includes denying

Officers of Color overtime opportunities, weekend shifts, and deliberately placing Officers of Color in positions where they will be subject to lengthy commutes.

69.     Each of the Individual Defendants had actual and/or constructive knowledge that their subordinates engaged in discriminatory and/or retaliatory conduct against Officers of Color that posed a pervasive and unreasonable risk of injury. This knowledge came from, among other things, the repeated complaints about discrimination, harassment, and/or retaliation regarding Officers of Color; the MSP's own data demonstrating that Officers of Color were underrepresented in leadership positions and/or were disciplined at a higher rate and more severely than Caucasian officers, their supervisory authority over the IAD and/or Office of Fair Practices.

70.     Likewise, each of the Individual Defendants' response to this knowledge of discriminatory conduct against Officers of Color was so inadequate as to show deliberate indifference or tacit authorization of the conduct.

71.     As a result, each of the Individual Defendants' inaction caused the constitutional injuries to the Plaintiffs and the class they seek to represent.

### Individual Plaintiffs' Allegations

### Plaintiff Byron Tribue

Officer Tribue's Background and Performance

72.     Officer Tribue has been subjected to discrimination and retaliation by MSP, including being suspended for 301 days for an alleged one-hour error in recording his time card, and being denied promotions, during the course of his employment with MSP.

73.     Officer Tribue is a Black man.

74.     Officer Tribue is employed as a Sergeant with MSP and has been employed with MSP from February 1, 2010 until the present. During his employment with MSP, Officer Tribue

has been recognized as a good performer and received professional recognition for the same. For example, in 2018, Officer Tribue earned the Non-Commissioned Officer of the Year for the Forestville Barrack in 2018, and then won this prestigious award again in 2022 at the Rockville Barrack, and also earned the highest performance rating of "Exceeds Expectations" in the two years before MSP chose to suspend him.

75.     In 2019, Officer Tribue ranked number 26 out of 96 on the Sergeant Promotional List. MSP appointed him as the Acting Sergeant of his group for nine months. Likewise, in 2023, he ranked 7 out of 61 for the First Sergeant/Detective Sergeant Promotional List.

Officer Tribue's Prior Complaints of Discrimination

76.     During Officer Tribue's time with the MSP, he has observed many instances of discrimination against Officers of Color, and experienced discrimination himself. Officer Tribue has repeatedly spoken out about this discrimination, and is known to his colleagues and the MSP management as someone who has repeatedly opposed discrimination in the workplace. Officer Tribue prides himself on his willingness to speak out when he observes injustice. As a result of his complaints and opposition to discrimination, MSP has further subjected Officer Tribue to discrimination and retaliation.

77.     Officer Tribue's complaints included complaints about discriminatory behavior of a higher-ranking employee, Detective Sergeant Christopher Bowling.

78.     For example, Officer Tribue complained that D/Sgt. Bowling gave more opportunities for coveted overtime shifts to his Caucasian officer friends who were stationed outside of the Barrack, often those from Southern Maryland, instead of giving these shifts to Officers of Color within the Barrack. This meant that Officer Tribue along with other Officers of Color lost out on overtime opportunities and the overtime pay. No legitimate business need

existed for D/Sgt. Bowling to do this. Officer Tribue complained to D/Sgt.  Bowling about this many times, including in late 2019. Officer Tribue also complained about this to other members of MSP management in the Barrack.

79.     On January 28, 2020, Officer Tribue complained about another incident with D/Sgt. Bowling. A Caucasian officer outside the Barrack engaged in an unauthorized police chase with his car, which resulted in him running into an unrelated person's land and causing damage. The matter came to D/Sgt. Bowling's attention, but he declined to take any disciplinary action against this Caucasian officer. Based on Officer Tribue's observations and experience, if an Officer of Color had done something similar, they would face serious disciplinary action. Officer Tribue believed that D/Sgt. Bowling treated this officer more favorably because he was Caucasian. Officer Tribue complained about this disparate treatment to D/Sgt. Bowling.

MSP's Discriminatory and Retaliatory Suspension of Officer Tribue

80.     On Thursday, February 13, 2020 MSP suspended Officer Tribue for allegedly misrepresenting a single hour on his time sheet. At the time of the suspension, Officer Tribue had approximately 620 hours of Annual Leave. Officer Tribue was in a "use or lose" scenario because under MSP policy, he could only carry 600 hours into the new year. Thus, MSP knew that Officer Tribue had more than sufficient earned Annual Leave to cover this hour of time. Notably, MSP suspended Officer Tribue approximately three weeks after his discrimination complaint to D/Sgt. Bowling.

81.     The suspension was for an alleged incident in January 2020. On the date in question, Officer Tribue was scheduled to have a day off. However, the Commander of the Forestville Barrack requested that Officer Tribue attend a Supervisors meeting. While Officer Tribue could have claimed two hours of overtime for coming to the meeting, Officer Tribue

opted to leave work one hour early on a later date, with permission from his supervisor. This is a common practice used by MSP officers statewide.

82.    On February 13, 2020, MSP told Officer Tribue he was being suspended for allegations of theft—the one hour he left early—and false reporting—the hour he did not claim when he left work one hour early.

83.    Furthermore, Officer Tribue had plenty of leave accrued and enough personnel were on duty and working that night. Nonetheless, MSP suspended him.

84.    MSP told Officer Tribue about the suspension after he arrived at work. MSP then notified Officer Tribue that because he was being suspended, MSP would have to confiscate his vehicle, and asked him to remove all of his belongings from it. Officer Tribue stood outside in the parking lot, removing his personal possessions one by one, including his kids' two car seats. Employees stood by and watched Officer Tribue do this, making it clear that Officer Tribue was being placed on suspension. However, MSP did not notify employees that Officer Tribue had been suspended for a time card error of one hour. By publicly confiscating Officer Tribue's vehicle, the MSP made it appear that he had committed serious misconduct to warrant this public spectacle. A fellow trooper had to drive Officer Tribue home with his belongings. Officer Tribue was humiliated by MSP's actions.

85.    MSP assigned D/Sgt. Bowling—the same officer that Officer Tribue had previously lodged a discrimination complained against—to investigate his case.

86.    On April 3, 2020, Officer Tribue's supervisor confirmed that Officer Tribue had not engaged in misconduct regarding the time sheet incident. However, the MSP forced Officer Tribue to remain on suspension and an internal investigation continued.

87.    MSP refused to tell Officer Tribue what specific acts of misconduct they were charging him with, and what MSP was proposing as potential discipline until September 28, 2020, over seven months later. This extensive delay is contrary to MSP policy. There was no legitimate reason or justification for this lengthy suspension.

88.    Notably, this discriminatory and retaliatory suspension occurred shortly after the MSP ranking for the Sergeant Promotional List had been published in September 2020, and Officer Tribue was ranked 26 out of 96.

Proposed Discipline for Timecard Issue

89.    After more than seven months of investigation (for an alleged one-hour time card error), on September 28, 2020, MSP finally issued Officer Tribue his charges. MSP charged Officer Tribue with four counts: two counts of neglect of duty; unauthorized secondary employment; and conduct unbecoming. These were two Category C and two Category B violations. Under the MSP disciplinary system category, charges escalate with severity with each subsequent letter of the alphabet. Category B and C charges are early in the alphabet and are relatively minor charges. Category B is considered minor misconduct, while Category C is considered misconduct.

90.    While Officer Tribue denied the allegations, and firmly believed such disciplinary charges were unwarranted, at least these specific charges carried relatively light penalties. Under MSP's formal disciplinary matrix the maximum discipline for such charges is an eight day suspension without pay, and a $450 fine. Even though he denied the charges, and the charges were unfounded, Officer Tribue considered whether to accept this unwarranted discipline so that he could move on with his life and career.

91.     Instead, MSP decided to exceed the disciplinary matrix range and proposed a final disciplinary action against Officer Tribue of a 30 day suspension without pay and a demotion from Corporal to Trooper First Class (non-supervisory position). This was an unjustifiably severe punishment.

92.     Officer Tribue was particularly concerned about the demotion because it meant he would lose additional income, and because he had worked very hard to earn the rank of Sergeant, and he knew how hard it was for Officers of Color to gain promotions within the MSP.

93.     Officer Tribue inquired to MSP why they had ignored the disciplinary matrix, and MSP stated words to the effect of "if you don't like it, you can go to a Trial Board."

94.     Under MSP policy, a "Trial Board" is a three-member group selected to hold a hearing and determine the final outcome of a disciplinary case. Cases are referred to a Trial Board when a trooper refuses to accept the discipline offered by the MSP.

95.      Given the severity of the charges, Officer Tribue felt that he had no choice but to go to a Trial Board.

MSP Keeps Officer Tribue on Suspension After Serving Charges

96.     Under MSP policy, once the investigation was concluded, and Officer Tribue had received MSP's proposed disciplinary charges, MSP should have reinstated Officer Tribue to full duty. However, MSP refused to return Officer Tribue to work on or shortly after September 28, 2020, as they should have done pursuant to policy.

97.     Officer Tribue repeatedly asked MSP to reinstate him. MSP did not respond.

98.     The President of the National Association for the Advancement of Colored People (NAACP) of Prince George's County, MD wrote to the MSP on Officer Tribue's behalf, regarding the disparate discipline and promotions that Officers of Color, and Black troopers at

the Forestville Barrack in particular, faced, including Officer Tribue, and asking for Officer Tribue to be reinstated.

99.     In response to the letter from the NAACP, on October 30, 2020, MSP informed both Officer Tribue and the NAACP that his police powers would be reinstated; that is, Officer Tribue's suspension was over and he could return to work.

100.     Under MSP policy, after his police powers were reinstated, MSP was required to issue Officer Tribue the official Personnel Order to return to work. This is an official document and order that would tell Officer Tribue to return to work, so that he would know which shifts to report to and the location. Without it, Officer Tribue could not return to duty, nor would Officer Tribue know where and when to report. However, MSP did not issue the Personnel Order.

101.     Officer Tribue repeatedly followed up with the MSP for the Personnel Order, which should have been issued to Officer Tribue within days of the October 30, 2020 letter. MSP did not issue the Personnel Order until December 10, 2020, 41 days later. There was no legitimate justification for this delay.

102.     Officer Tribue returned to his work duties on December 10, 2020, 301 days after being suspended on February 13, 2020.

103.     The Individual Defendants had supervisory authority over Tribue and the officers alleged to have discriminated against him.


Officer Tribue's Loses Income from Suspension

104.     As a result of MSP suspending Officer Tribue, he lost substantial income. While on suspension for 301 days, MSP paid Officer Tribue his base salary in accordance with MSP policy. However, Officer Tribue stopped earning the overtime pay, or the extra shift differential

pay from weekend shifts that he regularly earned when he was not suspended, except for a brief period in the fall of 2020 when MSP asked Officer Tribue to pick up extra work from the Licensing Division.

105.    In addition, Officer Tribue lost income from losing his secondary employment working security. Like many MSP officers, Officer Tribue had secondary employment working as a security officer. These positions required Officer Tribue be a law enforcement officer in good standing. Because Officer Tribue was suspended, he was ineligible for these jobs, and lost out on this valuable supplemental income. It was also humiliating for Officer Tribue to have to inform his secondary employment about his suspension, and this damaged Officer Tribue's professional reputation with these employers.

## MSP's Trial Board for Officer Tribue

106.    MSP held Officer Tribue's Trial Board hearing on April 27, 2021.

107.    The Trial Board concluded that Officer Tribue should receive a punishment of ten days without pay, which is a small fraction of the 301 days MSP kept Officer Tribue suspended.

108.    The punishment Officer Tribue received was within the disciplinary matrix, and a significantly lighter punishment than what the MSP proposed.

109.    However, upon information and belief, no Caucasian officer has received even a ten day suspension for similar conduct.

## Denied and Delayed Promotion

110.    MSP's extensive suspension of Officer Tribue delayed his ability to be promoted to Sergeant.

111.    Prior to Officer Tribue's suspension, he had earned the Non-Commissioned Officer of the Year for the Forestville Barrack, and also was selected to serve as Acting Sergeant. Based on Officer Tribue's record and honors, he was a strong candidate for a promotion.

112.    Officer Tribue applied to participate in the promotion process, even though he was on suspension. MSP held Officer Tribue's interview in early September 2020.

113.    Shortly thereafter, MSP published the rankings of the Sergeant Promotional List. Officer Tribue was ranked number 26 out of 96 officers competing for a promotion to Sergeant. Given that MSP had more than 26 slots open for promotion to sergeant rank, Officer Tribue should have received the promotion based on his ranking.

114.    However, MSP's decision to charge Officer Tribue outside of the disciplinary matrix prevented his promotion. MSP placed Officer Tribue in a "Catch-22" situation. Under MSP policy, Officer Tribue was not eligible for promotion to Sergeant if he accepted the proposed demotion. However, if Officer Tribue contested the demotion and proceeded to Trial Board to challenge the demotion, he could not be considered for a promotion due to the Trial Board charges he faced. Whatever option Officer Tribue picked, he could not get the promotion.

115.    MSP scheduled the promotions to take place in January 2021, and MSP would not hold Officer Tribue's Trial Board until April 2021. In short, MSP's decision to charge Officer Tribue outside the disciplinary matrix caused him to not receive a promotion he had earned.

116.    The MSP awarded the promotions on January 13, 2021. Officer Tribue was removed from consideration due to his pending Trial Board, and therefore did not get the promotion. MSP notified Officer Tribue in advance of the January 13, 2021 that they were offering a promotion for the twenty-sixth candidate on the list, but due to his disciplinary charges he would not receive the promotion.

25

117.    Even after the Trial Board imposed the ten-day suspension on Officer Tribue, MSP did not grant him the promotion at the conclusion of the Trial Board.

118.    Under MSP policy, MSP should have awarded Officer Tribue the promotion because of his rank on the promotional list. The standard practice would be to issue Officer Tribue a Personnel Order with his promotion and assignment. However, MSP did not do this for Officer Tribue. Instead, MSP waited until the next promotion cycle to effectuate Officer Tribue's promotion, thus delaying his promotion. Because of Officer Tribue's prior ranking score of 26, at that point MSP had to award Officer Tribue the promotion. Upon information and belief, the MSP does not treat Caucasian officers who were on suspension this way when they were up for promotion based on their rank number.

119.    MSP ultimately awarded Officer Tribue his promotion to Sergeant in the September 2021 promotion cycle. However, even though a vacancy for a Sergeant position existed at the Forestville Barrack where Officer Tribue was stationed, MSP assigned him a Sergeant position in the Rockville Barrack, a significant commute from his home.

120.    As a result in the delay in promotion, Officer Tribue lost out on pay and the professional prestige of holding a Sergeant rank.

121.    In addition, because MSP requires officers to hold their rank for at least one year before being considered for future promotions, Officer Tribue's ability to receive promotions will be unjustly delayed going forward in his career with MSP.


MSP Does Not Subject Caucasian Officers to Similar Discipline

122.    MSP allows Caucasian officers the option of "getting time back" without treating them like the MSP treated Officer Tribue in February 2020.

123.    Caucasian officers leave early to "beat traffic" without issue. For example, at least one Caucasian officer leaves early on a regular basis multiple times a week to "beat traffic." In a leadership training class, Lt. Colonel Butler publicly stated that he knows troopers leave early to "beat traffic." Unlike Officer Tribue, MSP has not disciplined these Caucasian officers.

124.    During the course of Officer Tribue's suspension, a Caucasian officer in Officer Tribue's Barrack left his shift early, and got into a car accident.  MSP chose to merely write up this Caucasian officer without a suspension or investigation.

125.    In 2020, a Caucasian officer was charged with a Category E violation, which is more serious than the Category B and C violations that Officer Tribue was charged with. Category E violations fall under "very serious misconduct." This Caucasian officer who committed a serious offense received a 30 day suspension without pay, and a demotion, the same discipline MSP imposed on Officer Tribue for Category B and C violations.

126.    Another Caucasian officer received a speed camera violation nearly 30 miles outside of his work zone while he was on duty. The Caucasian officer was within an area he had not received permission to be in. Rather than charge him with false reporting or being outside of his patrol area without permission, MSP did not discipline him, and simply ordered him to pay the speed camera violation. In comparison, Officer Tribue had permission for his actions yet was suspended for 301 days.

127.    Two other Caucasian officers were regularly leaving their assigned areas early while still on duty. Both were involved in accidents in their assigned MSP cruisers while outside of their assigned areas without permission. MSP did not investigate or charge either officer. Instead, MSP retroactively granted these Caucasian officers use of leave.

128.    Other Caucasian colleagues have failed to report for duty because they were under the influence of alcohol. MSP granted these Caucasian officers a personal leave day and they were not charged with an offense.

129.    Two Caucasian troopers used excessive force in apprehending a suspect, which resulted in the suspect needing facial reconstruction surgery. Neither trooper was charged with an offense.

130.    During the time period of the incidents alleged by Plaintiff Tribue, MSP did not subject Cpl. Jason Oros to discipline, even though Oros had engaged in serious misconduct, and allowed Oros to work a preferential assignment in the licensing division, where Oros was allowed to work overtime and receive overtime pay.

131.    There is no legitimate, non-discriminatory reason for MSP's treatment of Officer Tribue.

**Plaintiff Matin Dunlap**

132.    Plaintiff Matin Dunlap is a Black man who has been subjected to discrimination, harassment, and retaliation at the MSP including most recently being denied a transfer to Specialized Units.

133.    For example, a Caucasian Corporal staged a banana on the windshield of Officer Dunlap's official vehicle, and was seen by many other MSP personnel. This was intended as, and understood by Officer Dunlap to be, a racist reference to Officer Dunlap, as a Black man, being "a monkey": one of the most noxious and dehumanizing stereotypes against Black people. This stereotype has been recognized by the Fourth Circuit Court of Appeals, *see, e.g., Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015). This incident also received media attention.

134.    Officer Dunlap complained to the MSP's Office of Fair Practice, the internal office which handles complaints of discrimination at MSP. The Office of Fair Practice determined the Caucasian officer had in fact placed a banana on Officer Dunlap's car, and that it was "wrong" to do so, but that placing a banana on Officer Dunlap's car could not be tied to racism or discrimination.

135.    MSP did not discipline the Caucasian officer. Instead, MSP repeatedly promoted him, and made him a Lieutenant and a commander of an MSP Barrack where, according to MSP records, one-third of the troopers are Black. MSP has recently placed him in an elite Specialized Unit in the Criminal Enforcement Division.

136.    Following Officer Dunlap's complaint, MSP re-opened an already closed complaint that had been lodged against Officer Dunlap regarding a traffic stop, for which Officer Dunlap had already been cleared of any misconduct. Re-opening such an old, closed complaint violated MSP policy, but MSP allowed this action to move forward immediately after Officer Dunlap's discrimination complaint to the Office of Fair Practice.

137.    As a result, MSP placed Officer Dunlap on an unpaid suspension, and even charged him criminally, and kept him on suspension for three years. This stemmed from an alleged incident of misconduct that the MSP had already cleared him of before he complained about the racist conduct of the Caucasian officer.

138.    MSP did not substantiate the allegations against Officer Dunlap, and ultimately had to return him to work at the MSP in 2019. Since then, MSP has repeatedly continued to discriminate and retaliate against Officer Dunlap, including denying him assignments to Specialized Units.

139.    In particular, since December 2019, MSP has denied Officer Dunlap's applications to work in Specialized Units within the Criminal Enforcement Division, Licensing, Criminal Intelligence Section, and the Academy. Although Officer Dunlap has extensive experience in these fields, MSP has repeatedly selected less qualified Caucasian officers, some with little to no experience in these fields. MSP has never provided selection criteria, a ranking, or any other information about how and why MSP has repeatedly selected Caucasian officers with less experience and qualifications than Officer Dunlap for these Specialized Unit Positions. No legitimate, non-discriminatory justification exists for MSP's actions towards Officer Dunlap.

140.    During the covered time period, Plaintiff Dunlap applied to work in the Licensing Unit, a Specialized Unit at MSP, and his application was denied. During this same time period, MSP allowed Cpl. Jason Oros to work in the licensing division, where Oros was allowed to work overtime and receive overtime pay.

141.    The Individual Defendants had supervisory authority over Dunlap and the officers alleged to have discriminated against him.

**Plaintiff Analisse Diaz**

142.    Plaintiff Analisse Diaz has been subjected to discrimination, harassment, and retaliation at the MSP, including her termination.

143.    Officer Diaz is a Black Puerto Rican woman.

144.    Officer Diaz was a State Trooper with the Maryland State Police for eight years from January 2012 until MSP terminated her on October 24, 2019.

145.    Throughout her time at MSP, Officer Diaz faced a work environment permeated with racism. For example, Officer Diaz's First Sergeant told her that he did not think it was a

"big deal" to say the "n-word" or words to that effect. On one occasion when Officer Diaz was cleaning something in the Barrack she was told that MSP should hire her as the cleaning staff. The comment was intended as, and understood by Officer Diaz, that Officer Diaz was more suited for janitorial work than work as an MSP officer because she was Hispanic.

146.    Nonetheless, Officer Diaz was an exemplary employee and received praise for her dedication to the State Police force. Members of the MSP Drug Enforcement Unit, a Specialized Unit within MSP, asked Officer Diaz to work on specific missions for them both because of her skills as an officer and her fluency in Spanish. Officer Diaz began formally applying to join the Drug Enforcement Specialized Unit. However, MSP did not select Officer Diaz and instead selected Caucasian officers who were not better qualified, nor did they speak Spanish.

147.    Officer Diaz's supervisor, Sgt. David Hooper, expressed displeasure at Officer Diaz receiving special assignments, and believed such assignments should be given to Caucasian officers. When Officer Diaz was offered the opportunity to take a prestigious training, Sgt. Hooper blocked her from taking it, and expressed that such training should go to the Caucasian officers in the Barrack.

148.    While Sgt. Hooper at first endorsed Officer Diaz's training opportunity, he later spoke to Officer Diaz's then first sergeant and expressed that he did not believe Officer Diaz was qualified nor deserved to attend the training opportunity. Sgt. Hooper's comments led Officer Diaz's first sergeant to deny Sgt. Hooper's endorsement, thus preventing Officer Diaz from attending the prestigious training.

149.    After Officer Diaz was offered a chance to participate in the special training, Sgt. Hooper and Officer Diaz's Corporal began to retaliate against Officer Diaz, including asserting

unwarranted criticism of her performance and writing her up, while not doing the same to Caucasian officers.

150.    Next, MSP gave Officer Diaz a poor performance review that would bar her from participating in the upcoming promotional cycle, even though she was a strong candidate for a promotion. The alleged reason for the poor performance rating was that Officer Diaz had poor monthly statistics, such as number of traffic stops. However, other Caucasian troopers in her group had similar monthly statistics, and these Caucasian troopers did not receive poor performance reviews.

151.    Officer Diaz appealed the poor review. In response, management escalated retaliation, including placing her on a PIP, suspending her overtime privileges, and scrutinizing her work. MSP did not do the same to Caucasian troopers. In January 2018, Sgt. Hooper referred her to the Internal Affairs Department for discipline. MSP does not refer Caucasian officers to the Internal Affairs Department for similar or worse conduct.

152.    In February 2018, Officer Diaz made a complaint of discrimination to the Office of Fair Practice. Shortly thereafter, MSP notified Officer Diaz that the MSP Office of Internal Affairs was placing her under investigation. MSP suspended Officer Diaz while the investigation was conducted.

153.    On April 18, 2018, the Office of Fair Practice issued Officer Diaz a letter stating that they had found no probable cause for her allegations of discrimination. While it only took MSP approximately two months to determine that Officer Diaz's allegation of discrimination were to be dismissed, it took MSP nearly eighteen months to investigate Officer Diaz.

154.    The Internal Affairs Department added additional charges, and ultimately proposed terminating her.  While other Caucasian officers engage in the same type of low level

mistakes Officer Diaz was accused of making, and worse conduct, MSP does not propose terminating them.

155.    Officer Diaz declined to accept termination as a penalty, and so her case proceeded to a Trial Board. MSP ultimately held a Trial Board on June 3-4, 2019. On September 24, 2019, the Trial Board issued a written report recommending that Officer Diaz be terminated. The decision became official on October 22, 2019, when the Superintendent reviewed, concurred, and signed the Trial Board report. MSP notified Officer Diaz of the decision on October 24, 2019.

156.    MSP does not terminate Caucasian officers for similar or worse conduct. For example, while working for the MSP, Officer Diaz witnessed multiple Caucasian counterparts be charged with drunk driving and serious accidents, including flipping vehicles. These colleagues were not terminated. Instead, MSP merely transferred them. Another Caucasian officer left his gun at a convenience store, and he was not terminated.

157.    No legitimate, non-discriminatory reason existed for MSP's actions towards Officer Diaz.

158.    The Individual Defendants had supervisory authority over Diaz and the officers alleged to have discriminated against her.

## CLASS ACTION ALLEGATIONS
## UNDER SECTION 1983, TITLE VII AND THE MHRA

159.    In accordance with Federal Rule of Civil Procedure 23, Officer Tribue, Officer Diaz and Officer Dunlap ("Class Representatives") incorporate all allegations from this Complaint and assert claims for class-based discrimination against Officers of Color by virtue of Defendant the State of Maryland's violations of Title VII of the 1964 Civil Rights Act and the

Maryland Human Relations Act, and against the individual Defendants for their violations of Section 1983.

160.    Class Representatives bring these claims on behalf of themselves and all Officers of Color (including Black, Hispanic, and Asian, South Asian and Middle Eastern officers) who were denied promotions and/or disciplined (including charges, investigations, suspensions, demotions, and/or terminations), and otherwise subject to retaliation, discrimination, or harassment by the Defendants at any time from October 24, 2019 to the date of judgment.

161.    Class Representatives assert the following class-wide violations of Section 1983, Title VII, and/or the MHRA: Defendants' disciplinary policies and procedures constitute disparate treatment and evince discriminatory intent as the Defendants routinely impose excessive discipline on Officers of Color as compared to similarly situated Caucasian officers and this discipline is effectuated through MSP's centralized Internal Affairs Department.

162.    Likewise, the Defendants' promotion policies and procedures constitute intentional, disparate treatment against Officers of Color.

163.    Class Representatives also assert class-wide violations of Title VII and/or the MHRA that result in an unlawful disparate impact against Officers of Color compared to Caucasian officers regarding MSP's policies and procedures related to discipline and promotion.

164.    Moreover, the policies, practices, and procedures that governed the discipline and promotion decisions at MSP lacked sufficient objective standards, quality control, transparency, and oversight to ensure equal opportunity at MSP.

165.    The Defendants' centralized policies, practices, and procedures resulted in reduced promotional opportunities for Officers of Color compared to Caucasian officers, and caused Officers of Color to be disproportionately and unequally targeted for discipline.

166.    The Defendants employ a further policy of retaliating against Officers of Color who complain about discrimination, including disparate discipline as compared to Caucasian officers. The Defendants treat Officers of Color who report discrimination less favorably than Caucasian officers who report discrimination.

## A. Class Definition

167.    The proposed Rule 23 class consists of all Officers of Color who were employed by MSP from October 24, 2019 to the date of judgment.

168.    The proposed class is easily ascertainable. The number and identity of class members may be determined from MSP records. In fact, MSP maintains records of all promotions and disciplinary charges brought, their outcome, and these records include the data about the officer's race.

169.    The Class Representatives are members of the Class they seek to represent.

170.    The systemic race, color, and/or national origin discrimination, as well as retaliation, described in this Complaint is continuing in nature.

171.    The proposed class meets all the requirements of Federal Rule of Civil Procedure 23(a) and (b)(3).

172.    Class Representatives reserve the right to amend the class definition based on discovery or legal developments.

## B. Efficiency of Class Prosecution of Class Claims

173.    Certification of a class of Officers of Color similarly situated to the Class Representatives is the most efficient and economical means of resolving the questions of law and fact that are common to the claims of the Class Representatives and the proposed Class.

174.     The individual claims of the Class Representatives require resolution of the common questions of whether the Defendants have engaged in a systemic pattern or practice of race, color, and/or national origin discrimination against Officers of Color. Class Representatives seek remedies to eliminate the adverse effects of this discrimination in their own lives and careers and to eliminate the adverse effects of race, color, and/or national origin discrimination in the lives and working conditions of the proposed Class members.

175.     The Class Representatives have standing to seek relief from these practices because of the adverse effect that this discrimination has on them individually and on Officers of Color generally. The Defendants cause Class Representatives' injuries through its discriminatory practices, policies, and procedures and/or through the disparate impact its discriminatory practices, policies, and procedures have on Officers of Color. These injuries are redressable through a class-wide liability finding and associated relief.

176.     To obtain relief for themselves and the Class Members, the Class Representatives will first establish systemic race, color, and/or national origin discrimination as the premise for relief they seek. Without class certification, the same evidence and issues would need to be relitigated in many individual lawsuits with the attendant risk of inconsistent adjudications and conflicting obligations.

177.     The Class Representatives' claims are premised upon the bifurcated method of proof and trial for disparate impact and systemic disparate treatment claims of the type at issue here. This type of bifurcated method of proof and trial is the most efficient method of resolving these common issues.

178.    Certification of the proposed Class is the most reasonable and efficient means of presenting evidence and arguments necessary to resolve these questions for the Class Representatives, the Class members, and the Defendants.

**C.  Numerosity and Impracticability of Joinder**

179.    The Class that the Class Representatives seek to represent is so numerous that joinder of all members is impracticable as the proposed class is estimated to be greater than 100 individuals. In addition, the disposition of these individuals' claims as a class will benefit both the parties and the Court.

**D.  Common Questions of Law and Fact**

180.    The prosecution of the claims of the Class Representatives will require the adjudication of many questions of law and fact common to their individual claims and those of the Class they seek to represent.

181.    For example, Class Representatives and members of the proposed class they seek to represent have all been harmed by the Defendants' policy in that they have been denied promotions and/or experienced excessive discipline, been denied opportunities for advancement, and/or experienced retaliation.

182.    The common questions of law in this case include, among other things, (i)  the proper standards for proving a pattern or practice of discrimination by the Defendants against Officers of Color under both a disparate treatment and disparate impact theory of liability, (ii) whether the Defendants have engaged in unlawful, systemic race, color, and/or national origin discrimination, as well as retaliation, through its policies, practices and procedures affecting discipline and promotions, (iii) whether Defendants' failure to institute adequate objective criteria, quality controls, and/or oversight of those policies, practices, and procedures violations

Section 1983, Title VII and/or the MHRA, (iv) whether the Defendants' failure to prevent, investigate, or properly respond to evidence and complaints of discrimination in the workplace violates Section 1983, Title VII, and/or the MHRA (v) whether MSP is liable for continuing systemic violations of Title VII and/or the MHRA; and (vi) whether the Individual Defendants and MSP are liable for continuing systemic violations of Section 1983.

183.    The common questions of fact include, among other things, (i) whether the Defendants' policies, practices, and procedures treated, and continue to treat, Officers of Color differently than Caucasian officers in violation of Section 1983, Title VII and the MHRA; (ii) have the Defendants used promotion and/or discipline systems that lack objective standards, quality controls, and transparency; (iii) systematically, intentionally, or knowingly disciplined Officers of Color more often and/or more severely than Caucasian officers; (iv) systematically, intentionally, or knowingly promoted Officers of Color at a disproportionately lower rate compared to Caucasian officers; (v) whether MSP and/or the Individual Defendants have failed to prevent, investigate, or properly respond to evidence and complaints of discrimination in the workplace; and (vi) otherwise discriminated against Officers of Color in the terms and conditions of employment.

### E.  Typicality of Claims and Relief Sought

184.    The Class Representatives and the members of the proposed class have been subject to the same unlawful policies, practices, and procedures and thus have suffered similar harms.

185.    All putative class members have been subject to MSP's promotional and/or disciplinary policies and have experienced excessive discipline and other negative employment consequences, including retaliation, as a result.

186.    The Class Representatives' claims are typical of the claims that could be brought by any member of the class, and the relief sought is typical of the relief that could be sought by any member of the class in a separate action.

187.    The relief necessary to remedy the claims of the Class Representatives is the same as that necessary to remedy the claims of the proposed Class Members.

### F.  Adequacy of Representation

188.    The Class Representatives' claims are coextensive with those of the members of the proposed class. The Class Representatives seek to remedy the Defendants' discriminatory policies, practices, and procedures so Officers of Color will no longer be subject to disparate discipline, promotion opportunities, retaliation, and other terms and conditions of employment.

189.    The Class Representatives are willing and able to represent the proposed Class fairly and vigorously as they pursue their similar individual claims in this action.

190.    The Class Representatives have retained counsel who are experienced and competent in employment discrimination claims and in complex class-action litigation.

### G.  Rule 23(b)(3) Requirements

191.    The common issues of fact and law identified above affecting the claims of the Class Representatives and the proposed Class members predominate over any issues affecting only individual claims.

192.    Class action treatment will permit a large number of similarly situated persons to prosecute their claims in a single forum simultaneously, efficiently, and without the necessary duplication of effort and expense that numerous individual actions involve. Because the losses, injuries, and damages suffered by each individual class member are small in the sense pertinent

to class action analysis, the expense and burden of individual litigation would make it extremely difficult or impossible for the individual class members to redress wrongs done to them.

193.    Likewise, important public interests will be served by addressing the matter as a class action. Prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent and/or varying adjudications, establishing incompatible standards of conduct for the Defendants and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court may fashion methods to efficiently manage this action as a class action.

194.    Additionally, or in the alternative, the Court may grant "partial" or "issue" certification under Rule 23(c)(4). Resolution of common questions of law and fact would materially advance the litigation for all Class members.

## CLASS ACTION COUNTS

### COUNT I
### DISCRIMINATION BASED ON RACE, COLOR AND/OR NATIONAL ORIGIN IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-1, *et seq.*
### (On behalf of Class Representatives Tribue and Dunlap and Class Members v. State of Maryland)

195.    Class Representatives Tribue and Dunlap re-allege and incorporates each allegation in this Complaint as if fully set forth herein.

196.    This Count is brought on behalf of the Class Representatives and all members of the class.

197.    Defendant State of Maryland, through the Maryland State Police (MSP), an employer of the Class Representatives and Class members within the meaning of Title VII, has

intentionally discriminated against the Class Representatives and Class members by treating them differently from, and less preferably than, similarly situated Caucasian officers based on race, color, and/or national origin by subjecting them to discrimination in promotion opportunities in violation of Title VII.

198.    The discrimination MSP has engaged in against the Class Representatives and/or the Class members includes: Maintaining centralized disciplinary policies and procedures that disparately treat Officers of Color by imposing unfounded, unwarranted and overly severe and disparate penalties, including suspensions, terminations, demotions, transfers, and denials of promotions and other advancement opportunities; Maintaining centralized policies and procedures for promotions that disparately deny Officers of Color promotions; Intentionally discriminating against Officers of Color through disparate treatment of these officers through disciplinary measures and denial of promotions; Maintaining and allowing a hostile work environment, including, but not limited to, subjecting Officers of Color to racist comments and symbols such as using a paper training dummy at a MSP shooting range with a black face and "Afro  wig" for officers to shoot at; making a commemorative coin with the phrase "Make Waldorf Great Again;" commencing unwarranted and unfounded investigatory/disciplinary proceedings against Officers of Color; imposing overly severe disciplinary penalties; transferring Officers of Color to less favorable and/or more dangerous assignments and shifts; assigning Officers of Color to positions that require lengthy commutes; and/or denying Officers of Color overtime opportunities.

199.    Defendant's policies, practices, and procedures also have produced a disparate impact on the Class Representatives and the Class members.

200.     By reason of the continuous nature of Defendant's discriminatory conduct, which persisted throughout the employment of the Class Representatives and the Class members, the Class Representatives and the Class members are entitled to application of the continuing violations doctrine to all violations alleged herein.

201.     As a result of Defendant's conduct, the Class Representatives and Class members have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, including interest.

202.     By reason of Defendant's discrimination, the Class Representatives and the Class members are entitled to all legal and equitable remedies available for violations of Title VII.

203.     Moreover, due to Defendant's unlawful conduct, the Class Representatives and Class members have experienced, and continue to experience, pain, suffering, and/or impairment to their name and reputation, as a result of the discrimination. The Class Representatives and Class members are entitled to recover damages for these injuries from Defendant under Title VII.

204.     The Title VII claims are against Defendant State of Maryland but not the Individual Defendants.

205.     Attorneys' fees and costs should be awarded pursuant to Title VII.

**COUNT II**
**RETALIATION IN VIOLATION OF Title VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. § 2000e-1, *et seq*.**
**(On behalf of Class Representatives Tribue and Dunlap and Class Members v. State of Maryland)**

206.     Class Representatives Tribue and Dunlap re-alleges and incorporates each allegation in this Complaint as if fully set forth herein.

207.     This Count is brought on behalf of Class Representatives Tribue and Dunlap and all members of the class.

208.    Defendant State of Maryland, through MSP, an employer of the Class Representatives and Class members within the meaning of Title VII, has retaliated against the Class Representatives and Class members by taking adverse actions against them after they engage in protected conduct more often and/or severely than MSP does to similarly situated Caucasian officers.

209.    More specifically, MSP took retaliatory adverse actions against the Class Representatives and Class members because they engaged in protected activity, including opposing any practice made an unlawful employment practice, or because they have assisted and/or participated in any manner in an investigation.

210.    Moreover, MSP took retaliatory adverse actions against the Class Representatives and Class members more often and/or more severely than it did against Caucasian officers who engaged in similar conduct.

211.    As a result of Defendant's conduct, the Class Representatives and Class members have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, including interest.

212.    By reason of Defendant's discrimination, the Class Representatives and the Class members are entitled to all legal and equitable remedies available for violations of Title VII.

213.    Moreover, due to Defendant's unlawful conduct, the Class Representatives and Class members experienced, and continue to experience, pain, suffering, and/or impairment to their name and reputation, as a result of the discrimination. Class Representatives and Class members are entitled to recover damages for these injuries from Defendant under Title VII.

214.    The Title VII claims are against Defendant State of Maryland but not the Individual Defendants.

215.    Attorneys' fees and costs should be awarded under Title VII.

**COUNT III**
**DISCRIMINATION BASED ON RACE, COLOR AND/OR NATIONAL ORIGIN IN**
**VIOLATION OF THE MARYLAND HUMAN RELATIONS ACT, MD. CODE, STATE**
**GOV'T §§ 20-601 et seq. ("MHRA").**
**(On behalf of Class Representatives Tribue and Dunlap and Class Members v. State of**
**Maryland)**

216.    Class Representatives Tribue and Dunlap re-alleges and incorporates each

allegation in this Complaint as if fully set forth herein.

217.    This Count is brought on behalf of the Class Representatives and all members of

the class.

218.    Defendant State of Maryland, through the Maryland State Police (MSP), an

employer of the Class Representatives and Class members within the meaning of the MHRA, has

intentionally discriminated against the Class Representatives and Class members by treating

them differently from, and less preferably than, similarly situated Caucasian officers based on

race, color, and/or national origin by subjecting them to discrimination in promotion

opportunities in violation of the MHRA.

219.    The discrimination MSP has engaged in against the Class Representatives and/or

the Class members includes: Maintaining centralized disciplinary policies and procedures that

disparately treat Officers of Color by imposing unfounded, unwarranted and overly severe and

disparate penalties, including suspensions, terminations, demotions, transfers, and denials of

promotions and other advancement opportunities; Maintaining centralized policies and

procedures for promotions that disparately deny Officers of Color promotions; Intentionally

discriminating against Officers of Color through disparate treatment of these officers through

disciplinary measures and denial of promotions; Maintaining and allowing a hostile work

environment, including, but not limited to, subjecting Officers of Color to racist comments and

symbols such as using a paper training dummy at a MSP shooting range with a black face and "Afro wig" for officers to shoot at; making a commemorative coin with the phrase "Make Waldorf Great Again;" commencing unwarranted and unfounded investigatory/disciplinary proceedings against Officers of Color; imposing overly severe disciplinary penalties; transferring Officers of Color to less favorable and/or more dangerous assignments and shifts; assigning Officers of Color to positions that require lengthy commutes; and/or denying Officers of Color overtime opportunities.

220.    Defendant's policies, practices, and procedures also have produced a disparate impact on the Class Representatives and the Class members.

221.    By reason of the continuous nature of Defendant's discriminatory conduct, which persisted throughout the employment of the Class Representatives and the Class members, the Class Representatives and the Class members are entitled to application of the continuing violations doctrine to all violations alleged herein.

222.    As a result of Defendant's conduct, the Class Representatives and Class members have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, including interest.

223.    By reason of Defendant's discrimination, the Class Representatives and the Class members are entitled to all legal and equitable remedies available for violations of the MHRA.

224.    Moreover, due to Defendant's unlawful conduct, the Class Representatives and Class members have experienced, and continue to experience, pain, suffering, and/or impairment to their name and reputation, as a result of the discrimination. The Class Representatives and Class members are entitled to recover damages for these injuries from Defendant under the MHRA.

225.     The MHRA claims are against Defendant State of Maryland but not the Individual Defendants.

226.     Attorneys' fees and costs should be awarded pursuant to the MHRA.

**COUNT IV**
**RETALIATION IN VIOLATION OF THE MARYLAND HUMAN RELATIONS ACT,**
**MD. CODE, STATE GOV'T §§ 20-601 et seq. ("MHRA").**
**(On behalf of Class Representatives Tribue and Dunlap and Class Members v. State of**
**Maryland)**

227.     Class Representatives Tribue and Dunlap re-alleges and incorporates each allegation in this Complaint as if fully set forth herein.

228.     This Count is brought on behalf of Class Representatives Tribue and Dunlap and all members of the class.

229.     Defendant State of Maryland, through MSP, an employer of the Class Representatives and Class members within the meaning of the MHRA  has retaliated against the Class Representatives and Class members by taking adverse actions against them after they engage in protected conduct more often and/or severely than MSP does to similarly situated Caucasian officers.

230.     More specifically, MSP took retaliatory adverse actions against Class Representatives and Class members because they engaged in protected activity, including opposing any practice made an unlawful employment practice, or because they have assisted and/or participated in any manner in an investigation.

231.     Moreover, MSP took retaliatory adverse actions against Class Representatives and Class members more often and/or more severely than it did against Caucasian officers who engaged in similar conduct.

232.     As a result of Defendant's conduct, the Class Representatives and Class members have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, including interest.

233.     By reason of Defendant's discrimination, the Class Representatives and the Class members are entitled to all legal and equitable remedies available for violations of the MHRA.

234.     Moreover, due to Defendant's unlawful conduct, the Class Representatives and Class members experienced, and continue to experience, pain, suffering, and/or impairment to their name and reputation, as a result of the discrimination. Class Representatives and Class members are entitled to recover damages for these injuries from Defendant under the MHRA.

235.     The MHRA claims are against Defendant State of Maryland but not the Individual Defendants.

236.     Attorneys' fees and costs should be awarded under the MHRA.

## COUNT V
## RACE DISCRIMINATION IN VIOLATION OF FOURTEENTH AMENDMENT AND THE 1866 CIVIL RIGHTS ACT, 42 U.S.C. § 1983 ("Section 1983")
### (On behalf of all Class Representatives and Class Members v. All Individual Defendants)

237.     All Class Representatives re-allege and incorporate each allegation in this Complaint as if fully set forth herein.

238.     By the actions described above, the Individual Defendants  discriminated against the Class Representatives and members of the on the basis of their race, color, and/or national origin in violation of the 1866 Civil Rights Act, 42 U.S.C. § 1983 ("Section 1983") .

239.     The Fourteenth Amendment to the United States Constitution guarantees citizens equal protection of the laws of the United States, with violations thereof giving rise to claims for relief under 42 U.S.C. § 1983.

240.    42 U.S.C. § 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the United States Constitution and laws" by persons acting under the color of law. The right to be free from racial discrimination in employment and retaliation for assertion of one's civil rights were both clear and well-established rights, known to the Defendants in this action throughout the time period of the allegations of this Complaint.

241.    By the acts and omissions described above, the Defendants, while acting under color of state law, have engaged in a longstanding pattern or practice of discriminating against Officers of Color by, *inter alia*, maintaining a centralized disciplinary policies and procedures that disparately treat Officers of Color by imposing unfounded, unwarranted and overly severe and disparate penalties, including suspensions, terminations, demotions, transfers, and denials of promotions and other advancement opportunities; Maintaining centralized policies and procedures for promotions that disparately deny Officers of Color promotions; Intentionally discriminating against Officers of Color through disparate treatment of these officers through disciplinary measures and denial of promotions; Maintaining and allowing a hostile work environment; commencing unwarranted and unfounded investigatory/disciplinary proceedings against Officers of Color; imposing overly severe disciplinary penalties; transferring Officers of Color to less favorable and/or more dangerous assignments and shifts; assigning Officers of Color to positions that require lengthy commutes; denying Officers of Color overtime opportunities; and /or retaliating against Officers of Color who have opposed discrimination.

242.    The Defendants have, by the actions described herein, acted under the color of state law to discriminate against Plaintiffs and their members on the basis of race, color, national origin, and/or for making protected complaints of discrimination about the same, thereby depriving them of rights, privileges, and immunities secured to them by the Constitution and

laws of the United States and the State of Maryland, and in direct violation of the Fourteenth Amendment to the United States Constitution. Such injury has been and will continue to be irreparable.

243.    As a direct and proximate result of these acts, Plaintiffs and their members have been and continue to be deprived of their civil rights, suffered and continue to suffer loss of employment, loss of income, race, color, and/or national origin-based discrimination in job advancement, loss of other employment benefits, and have experienced, and continue to experience, pain, suffering, and/or impairment to their name and reputation, as a result of the discrimination.

244.    The actions of the Individual Defendants, in depriving Plaintiffs and their members of their constitutional and civil rights, were willful and malicious and constitute a continuing violation of the Fourteenth Amendment.

245.    At all times herein mentioned, the Defendants maintained a series of customs, policies and practices that proximately caused and continue to cause and that were likely to lead and continue to lead to the violation of Plaintiffs' and their class members' constitutional and civil rights. These acts, omissions, customs, policies and practices included, among others, the following:

a.    The Defendants continuing failure to stop, correct, prevent and eliminate discriminatory disciplinary practices and other discriminatory conditions of employment related thereto. This discrimination was known to or should have been known to all Defendants at all times mentioned herein;

b.    The continuing refusal and/or failure on the part of the Defendants, and its policy-making leaders, to fully and adequately stop, correct, or discipline Caucasian

officers who have engaged in acts of discrimination, including displays of racist images, racist slogans, and discriminatory treatment of employees;

      c.      The Defendants have engaged in and continue to engage in acts of retaliation against Officers or Color who complain of discrimination and racism within and by the MSP and/or support officers who complain of discrimination and racism within and by the MSP;

      d.      The Defendants maintain, facilitate and condone a severe or pervasive hostile work environment that is so hostile as to alter the terms and conditions of employment for Officers of Color; and

      e.      The Defendants facilitate an environment where Officers of Color who speak out against racism and/or complain about discrimination within the MSP are denied promotions and other positions to enhance their careers in the MSP.  Instead, Officers of Color who complain about discrimination are marginalized and given less prestigious positions within the MSP.

246.     As a direct and proximate result of the Defendants' unlawful and discriminatory conduct in violation of Section 1983, the Class Representatives and members of the Class have suffered and continue to suffer harm for which they are entitled to an award of damages and other relief to make them whole to the greatest extent permitted under the law.

247.     The 42 U.S.C. 1983 claims are against the Individual Defendants in their individual capacities.

248.     In addition, as the discrimination outlined in this Complaint is ongoing and continuous, the Class Representatives and members of the Class are entitled to injunctive relief.

249.     Attorneys' fees should be awarded under Section 1983.

**COUNT VI**
**RACE DISCRIMINATION IN VIOLATION OF THE FIRST AMENDMENT AND THE**
**1866 CIVIL RIGHTS ACT, 42 U.S.C. § 1983 ("SECTION 1983")**
**(On behalf of all Class Representatives and Class Members v. All Individual Defendants)**

250.    The Class Representatives re-allege and incorporate by reference each and every

allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

251.    By the acts and omissions described above,  the Individual Defendants , while

acting under color of state law, have maintained and continues to maintain an employment policy

and continuing practice of willful and intentional retaliation against those employees, Class

Representatives and class members included, who raise objections to the MSP's racially

discriminatory employment and policing practices, thereby depriving Plaintiffs of their rights to

petition the government for redress of grievances, as guaranteed by the First and Fourteenth

Amendments to the United States Constitution.

252.    Such retaliatory acts and omissions include, but are not limited to, the facts that

the Defendants regularly instigate unfounded and pretextual disciplinary charges against; harass;

disqualify from eligibility for promotion; refuse to promote; demote; transfer to undesirable

positions; and otherwise engage in adverse employment actions toward individuals who petition

the government to address and remedy racial discrimination within MSP.

253.    Such petition and complaints by Plaintiffs include, but are not limited to, informal

complaints to supervisors regarding racism in the workplace (including racism in hiring,

promotions, discipline, assignments, disparate treatment, and racist symbols); complaints to

MSP's Office of Fair Practice; complaints made during the course of the disciplinary process;

complaints to the EEOC and/or Maryland state and/or local Fair Employment Practice Agencies

(FEPAs); complaints to elected officials; comments to the media about racism at MSP.

254.     As a direct and proximate result of the policy and continuing practice of retaliation intentionally maintained by the Defendants, Plaintiffs have been and continue to be deprived of their civil rights, they have suffered and continue to suffer retaliation for exercise of First Amendment rights, harassment, and losses of work and wages, which collectively have caused them severe emotional distress, pain, and humiliation, in addition to actual wage losses.

255.     The 42 U.S.C. 1983 claims are against the Individual Defendants in their individual capacities.

256.     In addition, as the discrimination outlined in this Complaint is ongoing and continuous, the Class Representatives and members of the Class are entitled to injunctive relief.

257.     Attorneys' fees should be awarded under Section 1983.

## Prayer for Relief

For the foregoing reasons, Class Representatives respectfully request that the Court grant the following relief:

A.  Declaratory relief, including but not limited to a declaration that Defendants violated the laws of the United States, including Section 1983, the First Amendment and the Fourteenth Amendment to the Constitution, Title VII and/or the MHRA (the Title VII and MHRA claims, however, do not apply to the Individual Defendants);

B.  Injunctive relief, including but not limited to revision of MSP's disciplinary and promotion policies to comply with Section 1983, the MHRA and Title VII, and the appointment of an independent monitor to oversee the MSP's disciplinary and promotion policies and practices;

C.  Grant such additional equitable relief as is proper and just, including but not limited to, requiring Defendants to immediately enter into a plan to eliminate the practices noted in this Complaint at MSP;

D.  Compensation for loss of income, including back pay, front pay, and benefits;

E.  Compensation for emotional distress damages, including but not limited to damage to professional reputation;

F.  Immediately rescind and expunge any and all discipline issued to Class Representatives and their Class members from any and all files and records of the MSP;

G.  Immediately reinstate any and all Class Representatives and their Class members who were wrongfully terminated from employment due to the discriminatory acts complained of herein, with related compensation for lost pay and benefits;

H.  Immediately offer promotions to all Class Representatives and Class members who they have failed to promote due to discrimination, retaliation and the creation and maintenance of a severe and hostile work environment, with related compensation for lost pay and benefits;

I.  Give priority to Officers of Color in assignment to Specialized Units whose previous transfers were denied due to discrimination, retaliation and/or the creation and maintenance of a severe and hostile work environment;

J.  Punitive Damages in an amount to be decided by a jury.

K.  Pre-judgment and post-judgment interest at the highest lawful rate;

L.  Attorneys' fees and costs;

M.  Such other relief as the Court deems just and proper.

## Jury Demand

Plaintiffs demand a jury trial on the matters alleged herein.

Dated:  October 13, 2023                    Respectfully Submitted,

JOSEPH, GREENWALD & LAAKE, P.A.

__/S/ MICHAL SHINNAR_____
Michal Shinnar (Bar No. 19757)
*Senior Counsel*
mshinnar@jgllaw.com

__/S/ JAY HOLLAND_____
Jay P. Holland (Bar No. 06015)
*Principal*
Jholland@jgllaw.com
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
301.220.2200 (T)
301.220.1214 (F)

BACHMAN LAW

__/S/ ERIC BACHMAN_____
Eric Bachman  (Bar No. 16325)
4800 Hampden Lane, Suite 200
Bethesda, MD 20814
(202) 769-1681 (T)
(240) 303-8091 (F)
ebachman@ebachmanlaw.com

## <u>CERTIICATE OF SERVICE</u>

I hereby certify that on this 13th day of October 2023, a true and correct copy of the foregoing document was served on the Court's e-filing system, and thereby served on all counsel of record.

/s/ Michal Shinnar
Michal Shinnar, Esq.
Joseph, Greenwald and Laake, PA